## HARLEM METAL CORPORATION v. BROWN, Price Administrator.

### No. 24.

United States Emergency Court of Appeals.
Heard May 10, 1943.
Decided May 28, 1943.

Irwin Geiger, of Washington, D. C., for complainant.

Robert W. Ginnane, of Washington, D. C., Atty. (George J. Burke, Gen. Counsel, Nathaniel L. Nathanson, Asst. Gen. Counsel, and Benjamin Chapman and Walter L. Reitz, Jr., Attys., Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before VINSON, Chief Judge, and MARIS and MAGRUDER, Judges.

MARIS, Judge.

Complainant is a dealer in iron and steel scrap and is thereby subject to Revised Price Schedule No. 4—Iron and Steel Scrap, which establishes maximum prices for iron and steel scrap when sold to consumers. The questions presented by complainant's protest relate only to those provisions of the Schedule which establish maximum prices for steel scrap.

Revised Price Schedule No. 4[1] became effective on February 11, 1942, pursuant to Section 206 of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 926. Since its effective date the Schedule has established maximum prices for sales of steel scrap to consumers (steel mills, etc.) in terms of computed f.o.b. shipping point prices. The Schedule listed 39 basing points (representing the major scrap consuming centers) and prescribed dollars-and-cents basing point prices for the base grade of steel scrap, No. 1 heavy melting steel, at each basing point. Sec. 1304.13 (a); 7 F.R. 1208. Basing point prices for other grades of steel scrap were also stated. The shipping point for steel scrap is the point where it has been placed f.o.b. railroad car or f.a.s. vessel for shipment to the consumer. Sec. 1304.13(c) (1); 7 F.R. 1210. A shipping point price is computed by deducting from the appropriate basing point price the transportation charges from the seller's shipping point to the basing point. The Schedule generally establishes maximum shipping point prices for sellers with shipping points located outside a basing point as the basing point price "at the most favorable basing point, minus the lowest established charge for transporting scrap from the shipping point to such basing point by rail or water carrier, or combination thereof." Sec. 1304.13(c) (1) (ii); 7 F.R. 1210. The "most favorable basing point" is defined as the basing point which, when used to compute the shipping point price, will yield the highest shipping point price. Sec. 1304.13(b); 7 F.R. 1210. The price thus determined is the seller's maximum f.o.b. price.

However, as the Schedule became effective on February 11, 1942, it provided that: "Maximum shipping point prices at any shipping point in New York City, Brooklyn, N. Y., and New Jersey, which by reason of vessel rates have Buffalo or Sparrows Point as their most favorable basing point shall be computed from the prices at the

---

[1] 7 F.R. 1207.

Bethlehem, Pennsylvania basing point rather than the prices at Buffalo or Sparrows Point." Sec. 1304.13(c) (4) (ii) ; 7 F.R. 1210.

At all times since February 11, 1942, the Bethlehem basing point price for No. 1 heavy melting steel has been $18.25 per gross ton. The freight rate from most points in New York City to Bethlehem, Pennsylvania, is $2.92 per gross ton, which when deducted from the Bethlehem basing point price of $18.25, resulted in a maximum f.o.b. shipping point price for complainant and most other scrap dealers in New York City (including Brooklyn) of $15.33 per gross ton. The freight rate from certain points in northern New Jersey, including points in Hudson and Bergen Counties, the New Jersey counties immediately adjacent to New York City, to Bethlehem is $2.08 per gross ton. The deduction of this charge from the Bethlehem basing point price of $18.25 resulted in a maximum shipping point price of $16.17 per gross ton for these shipping points in northern New Jersey. Thus, the Schedule, as it originally became effective, established for complainant a maximum f.o.b. shipping point price of $15.33 per gross ton, while establishing for scrap dealers at certain shipping points in northern New Jersey a maximum price of $16.17. This difference of 84 cents existed without change from February 11, 1942, the effective date of Revised Price Schedule No. 4 under the Act, to June 17, 1942.

On June 17, 1942, the quoted provision establishing maximum shipping point prices for shipping points in New York City and New Jersey, was changed, by Amendment No. 6 to Revised Price Schedule No. 4, to read as follows : "The maximum shipping point price for No. 1 Heavy Melting Steel (with differentials established in paragraph (a) of this section for all other grades) at all shipping points in New York City or Brooklyn, N. Y., shall be $15.33 per gross ton f.o.b. cars or f.a.s. vessel, or where delivery to the consumer is solely by motor vehicle, loaded on such vehicle. The maximum shipping point prices at all shipping points in the state of New Jersey shall be computed from the most favorable basing point in terms of all-rail transportation charges." 7 F.R. 4490.

It will be observed that Amendment No. 6 did two things : (1) It restated in dollars and cents the maximum shipping point price which had been established for complainant and most other scrap dealers in New York City since February 11, 1942; and (2) it provided that maximum shipping point prices at all shipping points in the state of New Jersey should be computed from the most favorable basing point in terms of all-rail transportation charges, instead of from the Bethlehem basing point as previously provided. For certain points in Northern New Jersey, the "most favorable basing point in terms of all-rail transportation charges" is Conshohocken, Pennsylvania, with a basing point price of $18.75. Since the all-rail transportation charges from certain points in Hudson and Bergen Counties to Conshohocken are $2.53, this provision established for scrap dealers located at those points a maximum shipping point price of $16.22 per gross ton. Thus, Amendment No. 6 to the Schedule had the effect of increasing from 84 cents to 89 cents per gross ton the difference between complainant's maximum shipping point price and that established for certain shipping points in Northern New Jersey.

On August 3, 1942, complainant filed its protest against Revised Price Schedule No. 4, alleging that this difference of 89 cents provided scrap dealers located at points in New Jersey contiguous to New York City with an unfair competitive advantage over complainant and other New York dealers, in that such New Jersey dealers were thereby enabled to pay a higher price for steel scrap originating in New York City.[2]

On February 11, 1943, the Administrator issued Amendment No. 11 to Revised Price Schedule No. 4, effective February 16, which added to Section 1304.13(c) (4) (ii) the following: "Provided, however, that maximum shipping point prices at all shipping points in Hudson and Bergen Counties, New Jersey, shall be computed from the Bethlehem, Pa., basing point." 8 F.R. 1952.

[2] It is apparent from its protest that complainant is concerned only with competition from scrap dealers with shipping points in Hudson and Bergen Counties, the New Jersey counties immediately adjacent to New York City. Thus, as one method of relief, complainant suggested that the maximum shipping point price at all shipping points in Hudson and Bergen Counties be reduced to $15.33 (complainant's protest, par. 6).

Thus, Amendment No. 11 reinstated the method of computing maximum prices for shipping points in Hudson and Bergen Counties which had existed from February 11, 1942, to June 17, 1942. In other words, Amendment No. 11 restored the maximum shipping point price for complainant's competitors in Northern New Jersey to $16.17, the price which had been in effect prior to Amendment No. 6. Since the difference between complainant's maximum shipping point price and that of its competitors in adjacent New Jersey was again 84 cents, Amendment No. 11 had the effect of returning complainant to the same relative price position as it had between February 11 and June 17, 1942, prior to Amendment No. 6. On February 23, 1943, the Administrator dismissed complainant's protest, insofar as relief had not theretofore been granted by Amendment No. 11, on the ground that the protest was not filed within the period prescribed by Section 203(a) of the Emergency Price Control Act.

On March 12, 1943, complainant filed its complaint in this court seeking relief from the price differential of 89 cents alleged to have been created by Amendment No. 6. By paragraph (1) of his answer the Administrator avers that the complaint fails to state a claim upon which the relief sought can be granted inasmuch as the complainant's protest was not filed within the period prescribed by Section 203(a) of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 923. The issue thus raised was set down by the court for hearing in limine and is now before us for determination.

Section 203(a) provides, as follows: "Sec. 203. (a) Within a period of sixty days after the issuance of any regulation or order under section 2, * * * or in the case of a price schedule, within a period of sixty days after the effective date thereof specified in section 206, * * * any person subject to any provision of such regulation, order, or price schedule may, in accordance with regulations to be prescribed by the Administrator, file a protest specifically setting forth objections to any such provision and affidavits or other written evidence in support of such objections. At any time after the expiration of such sixty days any persons subject to any provision of such regulation, order, or price schedule may file such a protest based solely on grounds arising after the expiration of such sixty days. * * *"

■ Admittedly complainant did not protest Revised Price Schedule No. 4 within 60 days after February 11, 1942, its effective date. That schedule established a definite formula for computing complainant's maximum shipping point price which when applied produced the figure of $15.33 per gross ton. The schedule likewise established for complainant's competitors in Hudson and Bergen counties, New Jersey, a maximum shipping point price which computed at $16.17 per gross ton. The schedule thus set up a differential of 84 cents in favor of complainant's New Jersey competitors. Complainant might have protested these provisions of the schedule within 60 days after February 11, 1942, but having failed to do so it is now barred by Section 203(a) from protesting them to the Administrator or seeking in this court to set them aside.

■ We do not think that the adoption by the Administrator of Amendment No. 6 to Revised Price Schedule No. 4 had the effect of reviving complainant's right to protest the original provisions of the Price Schedule. The amendment, as we have seen, made no change in complainant's maximum price which it expressly fixed at the existing rate of $15.33 per gross ton. It merely changed the formula for computing the maximum price for scrap dealers at certain shipping points in Northern New Jersey so as to increase their price to $16.22 per gross ton. Consequently its sole effect was to increase complainant's adverse differential from 84 to 89 cents per ton. The Administrator concedes that the complainant was entitled to protest Amendment No. 6 to the extent that it increased the differential. But by Amendment No. 11 the Administrator cancelled the increase of 5 cents in the differential, restored complainant to its status prior to the promulgation of Amendment No. 6, and thereby afforded complainant all the relief to which its protest of Amendment No. 6 entitled it.

Complainant urges, however, that the adoption of Amendment No. 6 provided it with new grounds within the meaning of Section 203(a) for protesting the original provisions of Revised Price Schedule No. 4. We cannot accept this contention. As we have indicated, the only new grounds afforded by Amendment No. 6 related to the changes in the existing price structure which the amendment wrought. It cannot be that a change by the Administrator of a maximum price operates to do more than

open up for protest the amount of the change. To hold otherwise would open up established price structures to protest, complaint, and consequent doubt and unsettlement every time the Administrator makes any change therein, however slight. This would clearly be against the policy of the act which affords a limited period of 60 days for protesting price schedules and regulations. Moreover it would obviously handicap the Administrator in granting relief in meritorious cases of hardship for in each such case he would have to weigh the desirability of relieving the individual hardship against the undesirability from the public standpoint of reopening the price structure to general protest.

The present case illustrates the impracticability of such a construction of Section 203(a). Revised Price Schedule No. 4, and its predecessor under Executive Order, Price Schedule No. 4, had been in force for over ten months when Amendment No. 6 was adopted. These price schedules embodied a complicated price structure for the steel scrap industry which had become settled and in which the differential here in question was deeply embedded. During those ten months the industry had operated under this price structure. It is clear that to unsettle the structure now merely because of the comparatively small change made by Amendment No. 6 would not serve the statutory purpose of holding the price level against inflation.

We conclude that the Administrator rightly dismissed complainant's protest since in so far as it was directed to the 5 cents increase in the differential it was rendered moot by Amendment No. 11 and in so far as it was directed to the remaining 84 cents it was not timely filed.

The complaint is dismissed.