**NORTHWOOD APARTMENTS, Inc., v. BROWN, Price Adm'r.**

**No. 41.**

United States Emergency Court of Appeals.

Heard July 29, 1943.

Decided Aug. 27, 1943.

James Piper and Charles T. LeViness, both of Baltimore, Md. (W. Thomas Kemp, Jr., of Baltimore, Md., on the brief), for complainant.

Sol M. Linowitz, Atty., Office of Price Administration, of Rochester, N. Y. (George J. Burke, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, Nathaniel L. Nathanson, Asst. Gen. Counsel, and Maurice Alexandre and Nancy Fraenkel Wechsler, Attys., all of Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

Claim is made in this case that the Emergency Price Control Act, 56 Stat. 23, 50 U.S.C.A. Appendix § 901 et seq., requires the Administrator to establish maximum rents for housing accommodations covered by Federal Housing Administration mortgage insurance at the level of the rents generally prevailing for comparable accommodations, instead of the rents actually charged, on the

maximum rent date. The further, but subsidiary, point is urged that in the rent regulation in question the Administrator has discriminated against the owners of such housing accommodations in favor of certain owners of similar accommodations who are permitted to petition for adjustment of their individual maximum rents to the levels of "comparability" or whose maximum rents are directly fixed in the regulation on the comparability basis.

The applicable regulation is Maximum Rent Regulation No. 24 for Housing Accommodations Other than Hotels and Rooming Houses in the Baltimore Defense-Rental Area, which was issued on June 25, 1942, to become effective July 1, 1942. 7 F.R. 4793 et seq. Section 4 of the regulation prescribes as a general rule that the maximum rent for housing accommodations rented on April 1, 1941, shall be "the rent for such accommodations on that date." The regulation also prescribes several grounds upon which landlords may petition for individual adjustment to increase the maximum rent otherwise allowable; these adjustment provisions will be referred to more particularly at a later point in this opinion.

Complainant did not come within any of the exceptional adjustment provisions, and the application to it of the general formula established its lawful maximum rents as the rents which were actually being charged by it on the maximum rent date.

On August 24, 1942, complainant filed with the Administrator a protest against the regulation. The protest was denied by order issued March 30, 1943, and the present complaint was duly filed in this Court pursuant to § 204(a) of the Act.

The protest recited the following facts: Northwood Apartments, Inc., owns and operates an apartment house development consisting of 388 dwelling units in Baltimore, Maryland. The project had been financed by mortgage loan of $1,480,000 from the New York Life Insurance Company, insured by the Federal Housing Administration, under a commitment dated January 18, 1938, pursuant to § 207 of the National Housing Act, as amended, 52 Stat. 16, 12 U.S.C.A. § 1713; and the rules and regulations issued thereunder. This commitment established $15.50 as the maximum rent per room in the projected apartments and provided that such rent could not be increased without the prior approval in writing of the Federal Housing Administration, which

acquired all the preferred stock of the complainant corporation. The Federal Housing Administration has never given such approval to any increase in complainant's rents. The development was opened to the public in November, 1938; the apartments were immediately rented, and the entire building was filled by February, 1939. Both in the protest and accompanying affidavits, there are statements to the effect that on April 1, 1941, rentals of comparable accommodations were from 10 to 12% higher than those charged by complainant. As evidence of this, the experience of the Pentridge Apartments in Baltimore was cited. This development was privately financed by the same interests backing Northwood. It consisted of 208 additional units, built near Northwood and of substantially the same design, construction and equipment. Pentridge was opened to the public in September, 1940, at rents 12% higher than those at Northwood, and was filled within eight months. Complainant's manager stated in his affidavit that other apartment owners protested to the Federal Housing Administration against the low rentals established for Northwood because there was a vacancy of 5 to 8% in most apartment buildings in Baltimore. Finally, in support of its protest, complainant submitted an affidavit of Clyde L. Powell, Assistant Commissioner, Federal Housing Administration, dated September 1, 1942, stating that under the circumstances and in the absence of other control of the rentals of Northwood Apartments, Inc., the Federal Housing Administration would be willing to approve an increase in the rentals of Northwood Apartments, Inc., of approximately 6% over the rentals currently in force.

Complainant's rental charges were established in 1938 pursuant to § 207 of the National Housing Act, as amended, which provides that the Federal Housing Administrator is authorized to insure mortgages which cover property held by: "Private corporations * * * which, until the termination of all obligations of the Administrator under such insurance, are regulated or restricted by the Administrator as to rents or sales, charges, capital structure, rate of return, and methods of operation to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment." 52 Stat. 17. The section further provides that: "No mortgage shall be accepted for insurance under this section * * * un-

less the Administrator finds that the property or project, with respect to which the mortgage is executed, is economically sound." 52 Stat. 18.

These statutory provisions were supplemented by administrative regulations providing that:

"No charge shall be made by the mortgagor corporation for the accommodations offered by the project in excess of a rental schedule to be filed with the Administrator prior to the opening of the project for rental, which schedule shall be based upon a maximum average rental fixed prior to the insurance of the mortgage. Such schedule shall not thereafter be changed except upon application of the mortgagor corporation and the written approval of the Administrator. In establishing such maximum and in passing upon applications for changes, consideration will be given the following and similar factors:

"(i) Rental income necessary to maintain the economic soundness of the project.

"(ii) Relation of the proposed rentals to those currently being paid in the given community by families for whom this type of housing is intended." 24 Code Fed. Reg. § 532.17.

We assume that the normal routine was followed by the complainant and the Federal Housing Administration both in accepting the application for the mortgage insurance and, consequently, in fixing the schedule of rent charges for the dwelling units. This routine includes a personal survey and thorough investigation of the rental market in the neighborhood of the applicant's site to determine the amounts of rent currently being received by the owners of competitive housing for family units of the type and size proposed to be offered by the applicant.[1]

Section 2(b) of the Emergency Price Control Act, 50 U.S.C.A. Appendix § 902(b), provides that "in establishing any maximum rent for any defense-area housing accommodations, the Administrator shall ascertain and give due consideration to the rents prevailing for such accommodations, or comparable accommodations, on or

about April 1, 1941." The Administrator found that defense activities began to effect increases in rents in the Baltimore Defense-Rental Area on or about April 1, 1941, and adopted for that area the maximum rent date suggested in the statute. The validity of this method of rent control has been considered by us and upheld as a generally fair and equitable method of establishing rents in a defense-rental area. Chatlos v. Brown, Em.App., 136 F.2d 490, decided May 28, 1943; Lakemore Company v. Brown, Em. App., 137 F.2d 355, and Taylor v. Brown, Em.App., 137 F.2d 654, decided July 15, 1943. As was pointed out in the Chatlos case, "Rentals are thus rolled back and frozen as of an earlier date and at levels which landlords and tenants had worked out for themselves by free bargaining in a competitive market prior to the time when defense activities had injected into the market an abnormal factor resulting, or threatening to result, in rent increases inconsistent with the purposes of the Act." [136 F.2d 493.]

Complainant has no quarrel with these decisions, nor with the maximum rent date selected for the Baltimore area. Nevertheless it insists that the Administrator cannot apply the general formula, but rather is required by § 2(b) of the Act to establish maximum rents on a "comparability" basis in all situations where the rental charges in force on the maximum rent date were not the result of a free economic bargain in a competitive market, entered into between landlord and tenant on the maximum rent date or within a reasonable period prior thereto—otherwise, it argues, the maximum rents established by the regulation will not be "generally fair and equitable."

Based on this premise, complainant's contention is that the Administrator was required to use the comparability basis for determining complainant's maximum rents (and those of others in like situation), because the rents it was charging on the maximum rent date had not been worked out between it and its tenants in a free competitive market on or about that date, within the language of the Chatlos case. On the contrary, it asserts that the rents being charged

---

[1] Rental Housing Manual, Federal Housing Administration (1940) § 2352. FHA Form 2401, Appraisal Data and Project Information, required the submission of exhaustive physical, economic and social data concerning city-wide and neighborhood rental markets. Id. at § 2367. The third page of the form established a record of the rental housing survey and estimates from which the predicated rentals for the development were made. Id. at § 2341. The sponsors of the development in their application for mortgage insurance (FHA Form 2013) estimated the income of the various dwelling units. Id. at § 2157.

on that date were those fixed by the Federal Housing Administration back in 1938, and that Maximum Rent Regulation No. 24, therefore, had the effect of setting April 1, 1941, as the freezing date for other privately-owned property in the area, while setting a date in 1938 as the freezing date for complainant, thereby establishing its rentals at a lower and arbitrary figure.

■ From the exposition earlier in this opinion it must be assumed that the rental schedule established for Northwood in 1938 was adequate "to provide reasonable rentals to tenants and a reasonable return on the investment." Complainant must have thought so; otherwise it would hardly have embarked upon the development on that basis. The rents were fixed in the light of information supplied by the sponsors of the project. Competitive rents were taken into account. It may well be that the rents then determined were somewhat below the rental schedule of comparable units, but they were calculated to maintain the economic soundness of the project. Such variations exist in a normal competitive market. Higher rents might well result in lower occupancy and, consequently, in a lower return on the investment. In this very case the lower rental scale enabled complainant to achieve an occupancy of 100% within three months after the apartments were opened to the public, despite the fact that there was a vacancy of from 5 to 8% in most apartment buildings in Baltimore. "In the generality of cases (and so far as appears the present is no exception), in a normal competitive market each landlord presumably pursues the rental policy which in his judgment is most economically advantageous to him. The maximum rent date method of rent control recognizes the resulting differentials in rents, and preserves them." Lakemore Co. v. Brown, supra.

■ Nor is it of particular significance that complainant's rents have not been raised since 1938. That may be true in the case of many other landlords whose maximum rents are governed by the general formula prescribed in the regulation. The selection of a maximum rent date necessarily means that the rents for particular housing accommodations are frozen at the level of the last increase or decrease before the selected date. If landlords, in negotiating leases on or about the maximum rent date, chose to leave unchanged an old rental schedule, this is presumably because, in their business judgment, such rents were appropriate in the then existing state of the competitive market. Of course it would have been arbitrary and capricious for the Administrator to designate April 1, 1941, as the maximum rent date for everyone else in the area while setting a date in 1938 for Northwood. But complainant is in error in attributing this effect to Maximum Rent Regulation No. 24.

■ It is true that under the arrangement between complainant and the Federal Housing Administration the initial scale of rentals had to be approved by that agency. For present purposes this only signifies that in the concurrent judgment of the Federal Housing Administration and of the complainant the rents established were sufficient to afford a reasonable return on the investment; and complainant proceeded to bargain with tenants on that basis.

■ It is also true that complainant had agreed not to increase its rents subsequently without the approval in writing of the Federal Housing Administration. It is averred in the protest that from 1938 up to and including April 1, 1941, there had been no decrease in the services, furnishings, equipment or accommodations provided by complainant for its tenants, but that, because of the low schedule of rents and the increased costs of operation and maintenance, its profits had decreased steadily during those years. If these facts were true complainant might have had good ground for applying to the Federal Housing Administration for permission to make an increase in rents. It would have been the duty of the Federal Housing Administration to permit an increase of rents sufficient to maintain the economic soundness of the project, provided the higher rents could have been obtained in the then existing state of the market. If complainant felt, subsequent to 1938, that its rental schedule had fallen below the reasonable levels of competitive bargaining, it normally would have been expected to seek the consent of the Federal Housing Administration to the negotiation of new leases on a higher rent basis. Its failure to do so evidences its acquiescence in, if not its satisfaction with, the schedules in effect on the maximum rent date. Perhaps complainant had been turning over in its mind whether to seek an increase, "but just hadn't gotten around to it." That also may be the unfortunate case of many other landlords subject to the regulation. Land-

lord A may have increased his rents in March, 1941, while landlord B may have put into effect an increase in June, 1941. The regulation then comes along and freezes rents as of April 1, 1941. Landlord A keeps his increase; landlord B must relinquish his. This is the inescapable result of the rent date method of rent control, which draws a deadline.

Concluding on this phase of the case, it seems to us that the reasons which render the maximum rent date method of rent control "generally fair and equitable," as explained in our previous decisions, apply with equal force to landlords in the present complainant's situation having mortgages insured by the Federal Housing Administration. We therefore reject complainant's argument that under § 2(b) of the Act the Administrator was required to establish complainant's maximum rents on the basis of rents generally prevailing for comparable accommodations in the area on the maximum rent date.

It is further argued, however, that the regulation is arbitrary and capricious because it does provide for adjustments to the levels of "comparability" in cases substantially identical in principle with that of complainant and others in its class, thereby subjecting complainant to a discrimination in treatment having no rational basis.

This contention requires us to examine whether the situation of housing accommodations with Federal Housing Administration mortgage insurance falls within the general pattern for individual adjustments already provided in the regulation, even though the complainant's case does not fit exactly into any of the specific enumerated exceptional categories. Hillcrest Terrace Corp. v. Brown, 137 F.2d 663, decided by us July 27, 1943.

First, complainant asserts that its situation is substantially the same as that of a landlord who on the maximum rent date was operating under a written lease which had been in effect for more than one year. As to such a landlord the Administrator realized the inapplicability of the assumption implicit in the general formula for determining maximum rents, namely, that the rent which was in effect on the maximum rent date was the product of general market conditions of supply and demand on or about that date. For that reason, evidently, in § 5(a) (5) of the regulation the Administrator provided that a landlord might petition for an adjustment upward of the maximum rent to the level of comparability if he was operating on April 1, 1941, under a written lease which "had been in force for more than one year on that date" prescribing a rent substantially lower than that generally prevailing for comparable accommodations.

Since it is immaterial under this adjustment provision whether the landlord had endeavored to negotiate with his tenants before April 1, 1941, with a view to obtaining a higher rent than that prescribed in the long-term lease, complainant argues that it should be similarly immaterial whether it had endeavored to obtain the Federal Housing Administration's approval of an increased rental schedule before that date. But in all probability it would be futile for a landlord to try to persuade a tenant to give up the benefit of his long-term contract merely because the general trend in rentals was upwards. As the Administrator points out, in the absence of special circumstances a tenant will not pay a higher rent than his lease requires. It may well be, then, that the rent received by such a landlord on the maximum rent date does not reflect what he would have been able to obtain through competitive bargaining on that date. But in complainant's case, if conditions had warranted an increase of rents, there is no reason to assume that it would have been a futile gesture for complainant to apply to the Federal Housing Administration for permission to negotiate new leases with its tenants on the basis of a reasonable increase of rent. For the reasons already pointed out, we have no reason to assume otherwise than that complainant's rents in effect on April 1, 1941, reflected its business judgment, and that of the Federal Housing Administration, as to the appropriate rental scale in view of general market conditions of supply and demand on that date.

Complainant's next argument is that its case is substantially the same as that of landlords who may apply for adjustment pursuant to § 5(a) (4) of the regulation on the ground that the rent in effect on the maximum rent date was materially affected by the blood, personal or other special relationship between the landlord and tenant and as a result was substantially lower than the rent generally prevailing for comparable housing accommodations on that date. But in such cases a rent concession has been given to a favored tenant on some personal motive and does not represent a bargaining

valuation of the property for rental purposes under the then existing market conditions of supply and demand.

The other adjustment provisions in the regulation cover situations not closely analogous to that of complainant.

Finally, complainant charges discrimination against it by comparison with the way in which the regulation establishes maximum rents for housing accommodations constructed and owned by the United States or any agency thereof or by a State or any of its political subdivisions, or any agency thereof. In such cases § 4(g) of the regulation fixes the maximum rent as "the rent generally prevailing in the Defense-Rental Area for comparable housing accommodations on April 1, 1941" as determined in the first instance by the owner of such accommodations, subject to review by the Administrator.

Complainant asserts that there is no practical difference between rents charged by a limited-dividend low-cost housing project supervised and controlled by a government agency, and housing accommodations constructed and owned by such agencies. Since the Administrator has put the latter accommodations directly on the comparability basis, the argument is that there is no rational ground for dealing differently with the former.

The Administrator gave as his reasons for making this differentiation: "The considerations governing the establishment of maximum rents for the housing accommodations of the protestant and other landlords who received commitments from the Federal Housing Accommodation [Administration] are far different from those which dictated the establishment of maximum rents for accommodations constructed and owned by a Federal agency. Rents for the accommodations described in Section 4(g) of Maximum Rent Regulation No. 24 are not fixed in a competitive market. Such accommodations are generally constructed with governmental subsidies to provide housing for low income families and defense workers. Because of the varying standards for establishing rents under the statutes governing these projects, the comparability test is the only standard readily available for stabilizing such rents."

■ We think that the Administrator's point is well taken. Complainant is a limited-dividend corporation only in a technical sense. It is true that no dividends may be declared or paid in excess of the amount fixed by the Federal Housing Administrator at the time the mortgage was accepted for insurance,[2] but the entire surplus net income after such dividend is applied to the reduction of the mortgage.[3] The government-owned projects, on the other hand, furnish deliberately subsized low-rental housing accommodations. Admittedly, their rental schedules on the maximum rent date were not the product of ordinary competitive bargaining. They were predicated upon the needs of the low-income groups in the community and their ability to pay, and, unlike complainant's case, ordinary business considerations played no part in fixing these rents. Moreover, as pointed out in respondent's brief, "To continue in effect the low rents charged for public housing on April 1, 1941, will impose upon the taxpayers the burden of large government subsidies which may no longer be required in view of increased tenant in-

---

[2] "No dividends or distribution of income shall be declared or paid by the corporation in any one fiscal year in excess of an aggregate amount fixed by the Administrator at the time the mortgage is accepted for insurance. Such amount shall not exceed an amount equal to 6 per centum per annum of the equity as valued by the Administrator, but the Administrator may permit an additional stated amount not in excess of 2 per centum per annum payable out of surplus earnings of the corporation after provision for required reserves, provided that no such additional dividends or distribution shall be declared or paid unless the principal of the insured mortgage shall be prepaid in an amount at least equal to required interest and principal payments for the first amortization year." 24 Code Fed. Reg. § 532.17(c).

[3] Rental Housing Manual, Federal Housing Administration (1940) § 3311. This section prescribes the form of the mortgagors' certificate of incorporation (Form IA). We gather that the complainant's certificate of incorporation followed this form, since the section provides that: "Where the mortgage exceeds $100,000, Form IA must be followed. This form is based upon the laws of the State of Maryland and must be adapted to conform to applicable state law." Subsection (a) (5) states that: "Provision must be made for the application to the mortgage annually of all earnings of the corporation over and above current operating expenses, reserves and dividends."

comes." This feature of the regulation contains no arbitrary discrimination against complainant.

In one respect Northwood's situation is similar to that of the complainant in Hillcrest Terrace Corp. v. Brown, supra. In both cases we were concerned with housing accommodations whose mortgages were insured by the Federal Housing Administration, and, consequently, whose rental schedules had been approved by that agency prior to the maximum rent date. But at that point the similarity ceases. Hillcrest did not attack the regulation as applied to it on the ground that its rents were so fixed. Hillcrest's protest was directed to the relatively narrow situation where the rent charged on the maximum rent date reflected a temporary real estate tax exemption for new construction, the benefit of which the landlord had passed on to his tenants with the understanding of all concerned, including the Federal Housing Administration, that appropriate increases of rentals would shortly thereafter be made upon the expiration of the limited period of tax exemption. The Federal Housing Administration at the inception of the Hillcrest project—long before the maximum rent date—had given advance approval to such future increases, without which the project would not have been economically sound after Hillcrest went on the same basis of tax costs as applied to landlords generally. We pointed out that under the special circumstances presented, the rents which Hillcrest was receiving on the maximum rent date were not the product of general market conditions of supply and demand on that date.

The complaint is dismissed.