**BIBB MFG. CO. v. BOWLES,**
Price Administrator.

No. 59.

United States Emergency Court of Appeals.
Heard at Atlanta Oct. 20, 1943.

Decided Jan. 12, 1944.

A. O. B. Sparks, of Macon, Ga. (Charles M. Cork, of Macon, Ga., on the brief), for complainant.

Thomas I. Emerson, Associate Gen. Counsel, of Washington, D. C. (George J. Burke, Gen. Counsel, Nathaniel L. Nathanson, Asst. Gen. Counsel, and Sol M. Linowitz, Maurice Alexandre, and Nancy F. Wechsler, Attys., Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

LAWS, Judge.

Complainant is the owner of cotton mills located in the Columbus and Macon, Georgia, Defense-Rental Areas. Within the vicinity of its mills it owns four hundred ninety-eight dwelling houses, known as "company houses", which are rented to its employees. About 30% of the company's employees in the Macon Area and about 37% of those in the Columbus Area live in these houses. The rents charged have been less than those charged by other landlords for comparable accommodations. On July 1, 1941, complainant increased its rents to a level claimed to be required to cover maintenance costs and depreciation. However, after said increases, the rents continued to be below the level of comparable accommodations in the Areas.

Pursuant to authority granted by the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., respondent as Price Administrator issued maximum rent regulations governing both the Columbus and Macon, Georgia, Defense-Rental Areas. Maximum Rent Regulation No. 7, issued May 27, 1942, and effective June 1, 1942, established January 1, 1941, as the maximum rent date in the Columbus Area; and Maximum Rent Regulation No. 26, issued June 30, 1942, and effective July 1, 1942, established April 1, 1941, as the maximum rent date governing the Macon Area. Except as to the ceiling dates and the areas covered, these Regulations were identical.[1] As applied to complainant, the effect of the Regulations was to reduce the rents which might be charged for company houses to the levels prevailing before the increases of July 1, 1941.

By Section 5(a) (4) of each Regulation it was provided that any landlord might file a petition for adjustment to increase the maximum rent otherwise allowable, upon the ground that "the rent on the date determining the maximum rent was materially affected by the blood, personal, or other special relationship between the landlord and the tenant and as a result was substantially lower than the rent generally prevailing in the Defense-Rental Area for comparable housing accommodations * * *." Shortly after issuance of the Regulations, complainant filed with the Area Rent Director for each of the two Areas, a petition for adjustment pursuant to Section 5(a) (4), seeking approval of the increased rents it had charged beginning July 1, 1941. The petition filed with the Area Rent Director in Columbus was originally granted, but was subsequently reconsidered and denied. Complainant's petition for adjustment in the Macon Area was also denied.[2] These denials apparently were based upon an interpretation of Section 5(a) (4) made by the Office of Price Administration on September 30, 1942, to the effect that petitions for adjustments would be entertained only when the relationship of employer and employee had terminated, or probably would terminate in the near future.[3] By Supplementary Amendment No. 12, adopted December 23, 1942, and effective December 24, 1942, this interpretation

---

[1] On May 31, 1943, these and other Maximum Rent Regulations were combined and redesignated Rent Regulation for Housing. 8 F.R. 7322.

[2] Complainant filed protests with the Administrator against the orders denying its petitions for adjustment. Disposition of these protests has been postponed pending the outcome of the proceedings in this Court.

[3] Interpretation 5(a) (4)—II, Pike & Fischer OPA Service 200:1572.

was formally written into the Regulations.[4]

On February 13, 1942, complainant filed a protest against Supplementary Amendment No. 12 and Maximum Rent Regulations Nos. 7 and 26 as amended by Supplementary Amendment No. 12. Upon denial of this protest, complainant instituted the proceedings now before us.

■ Although complainant's principal attack in this Court is against the action of the Administrator in promulgating Supplementary Amendment No. 12, yet in the proceedings before the Administrator and this Court it has made arguments which challenge the validity of Maximum Rent Regulations Nos. 7 and 26 because they control rents of company housing accommodations. Section 203(a) of the Act provides that protest against any provision of a regulation must be filed within sixty days after its issuance and that after such sixty days have expired no protest will be entertained except upon grounds which have newly arisen. More than seven months elapsed after issuance of the Regulations before the filing of the protest upon which this proceeding is based. Supplementary Amendment No. 12, which had been issued in the meantime, did not re-subject the Regulations to any right of protest which had been available at the time when they were first issued.[5] Therefore, two of complainant's contentions are not properly before us, since they relate to the power to control rents of company houses. That power having been exercised by the Administrator's adoption of the original Regulations, attack upon it is barred by limitations of Section 203(a). One of these contentions is that company houses are far removed from communities affected by defense activities and, therefore, their rents are not within the control of the Administrator. The other is the argument that control of rents charged to employee-tenants constitutes a control of wages which is not within any powers granted the Administrator by the Act.

The principal attack in this case is made against Supplementary Amendment No. 12, which is said to deny to complainant and other owners of company houses individual adjustments of their rents, whereas by Section 5(a) (4) of the Regulations other landlords bearing the same kind of special relationships to their tenants are granted the right to seek adjustments. This action on the part of the Administrator is described as discriminatory and an arbitrary and capricious abuse of discretion.

■ The authority to establish specific categories as bases for individual adjustments was granted by Section 2(c) of the Emergency Price Control Act, which provides that the Administrator may include in any regulation such classifications and differentiations and may provide for such adjustments and reasonable exceptions as in his judgment are necessary or proper to effectuate the purposes of the Act. This Court has referred to the necessity, in the interest of effective administration of the Act, of allowing considerable leeway to the Administrator in the determination of the extent to which he will exercise the broad power conferred upon him by this Section,[6] and has indicated that if there is rational basis for his exercise of judgment it will control free from interference by the courts.[7]

Section 5(a) (4) was first adopted as one of seven specified categories established by the Administrator as the only circumstances which would constitute grounds for individual adjustments beyond levels imposed by maximum rent ceilings.[8] The provisions of the Section

---

[4] Section 5(a) (4) as amended reads as follows: "The rent on the date determining the maximum rent was materially affected by the blood, personal or other special relationship between the landlord and the tenant and as a result was substantially lower than the rent generally prevailing in the Defense-Rental Area for comparable housing accommodations on [the maximum rent date]: *Provided, That no adjustment under this subparagraph increasing the maximum rent shall be made effective with respect to any accommodations regularly rented to employees of the landlord while the accommodations are rented to an em-* *ployee, and no petition for such an adjustment will be entertained until the accommodations have been or are about to be rented to one other than an employee."* (Supplementary Amendment No. 12 appears in italics).

[5] Harlem Metal Corp. v. Brown, Em. App. May 28, 1943, 136 F.2d 242, 244.

[6] Lakemore Co. v. Brown, Em.App. July 15, 1943, 137 F.2d 355, 358.

[7] Ibid.; See also Dobson et al v. Commissioner of Internal Revenue, 64 S.Ct. 239, decided December 20, 1943.

[8] Lakemore Co. v. Brown, Em.App. July 15, 1943, 137 F.2d 355, 356. Two addi-

authorize landlords to apply for adjustments on the ground that the rent in effect on the maximum rent date was materially affected by the blood, personal or other special relationship between the landlord and tenant and as a result was substantially lower than the rent generally prevailing in the area for comparable housing accommodations on the maximum rent date. In commenting upon these provisions, we have stated that they relate to cases in which a rent concession has been given a favored tenant on some personal motive and the transaction does not represent a bargaining valuation of the property for rental purposes under existing market conditions of supply and demand.[9] It is to be noted that the provisions of Section 5(a) (4) conform to the general pattern of the individual adjustment provisions, which is that individual increases of rents will be permitted in those cases in which experience has shown the likelihood of an increase after the maximum rent date even in the absence of a housing shortage brought about or accentuated by defense activities. These individual adjustment provisions have been determined by the Administrator to be "consistent with the general plan of establishing maximum rents at levels reached through the normal bargaining of landlords and tenants before the impact of defense activities on the rental market in the defense-rental area."[10]

█ It is apparent that, with exceptions not pertinent here, the Administrator made no provision for individual adjustments of rents which on the maximum rent date had been fixed by the normal process of bargaining between landlord and tenant. By upholding the maximum rent date method of rent control,[11] we have approved the withholding of individual adjustments in such cases. The essential fairness of this method of control is found in its adoption of the rent levels established by landlords themselves at the most favorable rates which they could obtain by bargaining in a market unaffected by abnormal defense conditions. It is also apparent that the Administrator has made provision for individual adjustments of rents which on the maximum rent date had been fixed by landlords at rates below the level that would have been set by a normal bargaining process; in such cases the landlords had not sought to obtain from the transaction the available economic benefits. We find that this distinction is fair, since it would be unjust to deprive the landlords last mentioned of the benefit of the bargaining process, the element in the maximum rent date method which contributes so largely to its being fair and equitable. It remains for us to determine whether, after dealing differently with these two classes of cases, it was fair for the Administrator to exclude employer-landlords from the second class.

The record discloses that maintenance of company housing is a well established practice in the United States, as well as in other countries. Those who have given study to the practice have concluded that many considerations influence employers in developing this type of housing.[12] Among them are the desirability of selecting locations convenient to raw materials and power without regard to the prior existence of a labor supply in such locations, the attracting of a labor supply adequate in quantity and desirable in quality, and the promotion of loyalty, efficiency, and stability among employees. We think there is no doubt that employer-landlords generally have had in mind the benefits mentioned and doubtless others in the establishment and maintenance of these projects and have found that the projects are of substantial value to them. It is significant that cash rentals paid by tenants of company houses traditionally have been low. This supports the view that the theory behind the establishment of this type of housing is not that financial profit will result from the operation of the housing, but that the cost of the project will be more than offset by resultant gains in production by affiliated factories.

█ Bearing in mind the existence of these considerations and comparing the re-

tional categories have since been added. See Sections 5(a) (8) and 5(a) (9). Pike & Fischer OPA Service 200:359.

9 Northwood Apartments, Inc. v. Brown, Em.App. Aug. 27, 1943, 137 F.2d 809, 814.

10 Hillcrest Terrace Corp. v. Brown, Em. App. July 27, 1943, 137 F.2d 663, 665.

11 Chatlos v. Brown, Em.App. May 28, 1943, 136 F.2d 490.

12 See Leifur Magnusson, *Housing by Employers in the United States*, U. S. Bureau of Labor Statistics, Bulletin No. 263 (1920), p. 17 et seq., 245 et seq. and list of references commencing p. 248; *Urban Planning and Land Policies*, Supplementary Report of the Urbanism Committee, Vol. II, National Resources Committee (1939), p. 110 and bibliography commencing p. 153.

lationship between employer-landlords and employee-tenants to the special relationships covered by Section 5(a) (4), we think an obvious distinction appears. When landlords rent premises to their blood relations, friends or others to whom they sustain a special relationship and in so doing fix prices without purpose to gain the usual economic benefits from the transaction, they substitute a motive to confer favor in place of the motive to obtain profit which ordinarily controls. In such a case two elements concur: the first is the special relationship, which distinguishes the transaction from one between strangers or casual acquaintances, and the second is the deliberate forfeiture of economic benefit because of the relationship. In this class of cases, to adopt the language we used in the case of Northwood Apartments, Inc. v. Brown, supra [137 F.2d 814], "[the transaction] does not represent a bargaining valuation of the property for rental purposes under * * * existing market conditions of supply and demand." The landlord does not intend to draw to himself the greatest possible economic benefit; on the contrary, in many instances, he intends to sustain an economic loss. On the other hand, when landlords rent to their employees, only the element of special relationship exists. Complainant concedes that a motive to confer favor upon employees did not bring about the development of company housing projects. These housing enterprises were developed on a strictly business basis; they were intended to earn for their owners economic benefits in addition to the cash rents. It may be true, as claimed by complainant, that these benefits are incapable of definite ascertainment or measurement, but this does not deny their existence or that they are substantial. The anticipation of these benefits explains why rental prices were fixed at a low rate. Therefore, there was nothing unfair or discriminatory in the Administrator's action when by Supplementary Amendment No. 12 he classed employer-landlords with other landlords who established their rents on the maximum rent date through a normal bargaining process. And the Administrator was consistent in recognizing this distinction between complainant and the type of landlord covered by Section 5(a) (4), when in Supplementary Amendment No. 12 he provided that if the relationship of employer and employee terminates (and the economic factors which entered into the establishment of the rents are thus eliminated as incidents of the tenancy), adjustment may be sought by the landlord. The effect of the Supplementary Amendment was to hold employer-landlords to bargains they had struck before defense activities brought about greater demands for housing and a threat of inflation. This was the same treatment accorded landlords generally under the maximum rent date method of rent control.

Complainant argues that in the exercise of the authority granted the Administrator to control rents, he is confined to a consideration of the rental contracts which, so far as benefits are concerned, relate only to the amount demanded or received from tenants. This argument denies any right of the Administrator to consider collateral economic benefits which may or may not result from the relationship of landlord and tenant. This contention overemphasizes the form and overlooks the substance of the Administrator's problem. Generally speaking the Administrator is directed to effectuate the purposes of the Act by regulations which are generally fair and equitable and he is authorized to provide for such adjustments as he deems necessary or proper in effectuating the purposes of the Act. It would be an anomalous state of the law if, in carrying out these directions as they relate to rent control, the Administrator were not allowed to consider factors which clearly were a part of the bargain by which landlords established their cash rentals. If the factors were of importance to the landlords in the transaction, they become of importance to the Administrator in deciding whether to grant adjustments. Moreover, the contention of complainant, if adopted, would require the elimination of Section 5(a) (4) from the Regulations, since it is obvious that considerations other than the rental contracts between landlords and tenants were considered by the Administrator and made the basis of his action in promulgating this Section.

■■ Complainant next contends that if inquiry into the question of resultant benefits or lack of benefits from company housing is made, it will develop that there is quite as much economic loss as benefit from these projects. It is stated that employees not able to obtain company housing accommodations are discontented be-

cause compelled to pay higher rents elsewhere. It is also stated that some company housing projects have been abandoned. These statements are vague and general and may not be said to constitute a satisfactory showing that company housing projects are operated at economic losses. Particularly is this true when the record shows that these projects have been in existence for many years and are still maintained to a substantial extent.[13] But even granting the point were satisfactorily established, the result would not be controlling in complainant's favor. We have shown that the factor which distinguishes employer-landlords from the landlords covered by Section 5(a) (4) is not that they derive a net economic gain from their company housing projects, but that they undertook to establish their rents through a normal bargaining process. No duty is imposed upon the Administrator by the Act to permit increases in rents so as to relieve individual landlords who bargained badly. Lakemore Co. v. Brown, Em.App. July 15, 1943, 137 F.2d 355, 359.

We conclude that complainant has failed to show that the relationship between employer-landlord and employee-tenant falls within the class of special relationships recognized by Section 5(a) (4) as proper bases for individual adjustments in rents or that it was unfair to deprive employer-landlords of the right to obtain adjustments of the rents of company houses demised to their employees.

■ Complainant also attacks Supplementary Amendment No. 12 on the ground that it does not effectuate the purposes of the Act. It is conceded, however, that the Supplementary Amendment and the Regulations as amended by it have the effect of preventing increases in the rents charged by employer-landlords. Since, as we have already mentioned, the record shows that company housing facilities are occupied by a substantial number of workers, the prevention of even slight increases in their rents tends to suppress inflation in time of national emergency and thus effectuates the basic purpose of the Act.[14]

■■ Complainant argues that Supplementary Amendment No. 12 and the Regulations as amended violate the Fifth Amendment to the Constitution, in that they constitute a taking of complainant's property without due process of law and a taking of its private property for public use without just compensation. According to complainant's argument, due process of law requires that a landlord be permitted to adjust its rental to either (1) a rate sufficient to yield a fair return on the landlord's investment, or (2) a rate equal to that charged for comparable accommodations in the Area. In previous cases this Court has decided that neither the Act nor maximum rent regulations similar to the one here involved, by depriving a landlord of a fair return on the fair market value of his property, constitute a deprivation of property without due process of law or a taking of private property without just compensation, in violation of the Fifth Amendment.[15] By the same reasoning set forth in the cited cases the argument of complainant that it is deprived by Supplementary Amendment No. 12 of a fair return on its investment, is defeated. Therefore, the only Constitutional objection presented by complainant, which has not been disposed of by previous opinions of this Court, is the contention that it is entitled to an adjustment equalizing its rents with those charged for comparable accommodations. As we have stated, complainant's established practice has been to charge rentals lower than those charged for comparable accommodations. Under the maximum rent date method of rent control, with which Supplementary Amendment No. 12 is consistent, varying ceiling rents are established for comparable accommodations; such control embodies in the Regulations the differentials created and existing by action of the landlords. This type of regulation has been held to be a Constitutional exercise of administrative discretion.[16]

Other objections suggested by complainant have been considered and found to be without merit.

The complaint is dismissed.

---

[13] According to the National Resources Committee, company towns established by industries have reached their highest development in the United States. It has been estimated that over 2,000,000 inhabitants occupy them. *Urban Planning and Land Policies*, Supplementary Report of the Urbanism Committee, Vol. II, National Resources Committee (1939), p. 110.

[14] Madison Park Corp. et al v. Bowles, Em.App., December 27, 1943, 140 F.2d 316.

[15] Taylor v. Brown, Em.App. July 15, 1943, 137 F.2d 654, 660; Wilson v. Brown, Em.App. July 15, 1943, 137 F.2d 348, 353.

[16] Borden's Farm Products Co. Inc. v. Ten Eyck, 1936, 297 U.S. 251, 262, 56 S. Ct. 453, 80 L.Ed. 669.