137 F.2d 663 (1943)
HILLCREST TERRACE CORPORATION
v.
BROWN, Price Adm'r.
No. 17.
United States Emergency Court of Appeals.
Argued June 9, 1943.
Decided July 27, 1943.
Petition for Clarification or Modification Denied August 26, 1943.
Ben S. Fisher, of Washington, D.C., (James W. Bellamy, of Rapid City, S.D., on the brief), for complainant.
Morton Meyers, of Johnstown, Pa., (George J. Burke, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, and Nathaniel L. Nathanson, Asst. Gen. *664 Counsel, all of Washington, D. C., Sol. M. Linowitz, of Rochester, N. Y., and Maurice Alexandre, all of the Office of Price Administration, of Washington, D. C., on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
MAGRUDER, Judge.
The complaint here seeks review under § 204(a) of the Emergency Price Control Act, 56 Stat. 31, 50 U.S.C.A. Appendix, § 924(a), of an order of the Price Administrator denying a protest by Hillcrest Terrace Corporation directed against Maximum Rent Regulation No. 49 for Housing Accommodations Other Than Hotels and Rooming Houses in the Rapid City-Sturgis Defense-Rental Area, in the State of South Dakota.
Maximum Rent Regulation No. 49 was issued September 21, 1942, to become effective October 1, 1942. 7 F.R. 7500. In its general scheme of rent control it follows the pattern of the rent regulations considered by us in Chatlos v. Brown, Em. App., 136 F.2d 490, decided May 28, 1943, and Lakemore Company v. Brown, Em. App., 137 F.2d 355, Wilson and Bennett v. Brown, Em.App., 137 F.2d 348, and Taylor v. Brown, Em.App., 137 F.2d 654, decided by us July 15, 1943. For housing accommodations which were rented on March 1, 1942, the regulation prescribes that the maximum rent shall be "the rent for such accommodations on that date." This is the generally applicable formula, but the regulation also prescribes several grounds upon which landlords may petition for individual adjustment to increase the maximum rent otherwise allowable.
The selection by the Administrator of March 1, 1942, as the rent-freezing date bore hard upon complainant, for on that date it was operating its apartment building under a scale of rentals, approved by the Federal Housing Administration, which passed on to the tenants the benefit of a temporary real estate tax exemption for new construction, with the understanding of all concerned, including the Federal Housing Administration, that appropriate increases of rentals would shortly thereafter be made, upon the expiration of such limited period of tax exemption. No one of the prescribed grounds for individual adjustment quite fits complainant's case, and the burden of its argument is that the Administrator acted arbitrarily and capriciously in refusing to make appropriate amendment of the adjustment provisions.
The justification for the adoption by the Administrator of the maximum rent date method of rent stabilization is, as we pointed out in the Chatlos case, that rentals are thereby rolled back and frozen as of an earlier date at levels which landlords and tenants had worked out for themselves by free bargaining in a competitive market, prior to the time when defense activities had injected into the market an abnormal factor resulting, or threatening to result, in rent increases inconsistent with the purposes of the Act. While Congress undoubtedly sanctioned the Administrator's use of this as a generally applicable formula for determining maximum rents, it recognized that some provision for adjustments and exceptions would be essential in formulating workable maximum rent regulations. See Sen. Rep. No. 931, 77th Cong., 2d Sess., p. 17. Accordingly, it provided in § 2(c) of the Act, 50 U.S.C.A. Appendix, § 902(c), that the regulations "may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act."
The Administrator has exercised his power under § 2(c) to make provision for adjustments in numerous situations where, for one reason or another, the assumptions implicit in the general formula are not valid.
One such assumption is that the housing accommodations affected by the regulation remain substantially the same as on the rent-freezing date. Because the Administrator recognized that a major capital improvement or a substantial increase in the services furnished would destroy the validity of this assumption, he provided in § 1388.135 of the regulation that in such cases any landlord might file a petition for adjustment upwards of the maximum rent.
Another such assumption was that the rental in effect on the rent-freezing date was the product of general market conditions of supply and demand on that date, and thus in effect represented a bargaining valuation of the property for rental purposes as of that date, made by the landlord and tenant, and not unduly influenced by war conditions. But where the rental which was in force on the rent-freezing *665 date had been established by a lease entered into on a date considerably earlier, it is evident that such rental does not necessarily reflect market conditions of supply and demand on the rent-freezing date. Hence, the Administrator provided in the regulation that any landlord might petition for an adjustment upwards of the maximum rent if there was in force on March 1, 1942, "a written lease, which had been in force for more than one year on that date, requiring a rent substantially lower than the rent generally prevailing" for comparable housing accommodations on March 1, 1942. For somewhat similar reasons the Administrator provided for adjustments where the rent in force on March 1, 1942, was established by a lease which provided for a substantially higher rent at other periods during the term of such lease, or where the rent in force on March 1, 1942, was substantially lower than at other times of the year by reason of seasonal demand for such housing accommodations.
Finally, the Administrator recognized that the rent in force on the rent-freezing date might in particular cases have been fixed without any reference to market conditions of supply and demand; hence he provided that any landlord might petition for an adjustment upwards of the maximum rent if the rent in force on March 1, 1942, "was materially affected by the blood, personal or other special relationship between the landlord and the tenant and as a result was substantially lower than the rent generally prevailing" for comparable housing accommodations on that date.
The general pattern of these adjustment provisions is, as explained by the Administrator, that they permit an individual increase of rents in those limited classes of cases where experience has shown that an increase after the rent-freezing date would have been likely in a normal rental market even in the absence of a housing shortage brought about or accentuated by defense and war activities. "The individual adjustments thus provided for," says the Administrator, "are consistent with the general plan of establishing maximum rents at levels reached through the normal bargaining of landlords and tenants before the impact of defense activities on the rental market in the defense-rental area."
With the foregoing in mind, we must consider whether complainant here has presented a situation falling within the general pattern for individual adjustments already provided in the regulation, even though not fitting exactly in any of the specific enumerated categories.[1] If so, then the Administrator, when the situation was called to his attention by the protest, acted arbitrarily in refusing to expand the adjustment provisions to cover the situation  unless, indeed, there might be reason to believe that the particular amendment sought might entail so substantial an administrative burden as to impede the effective administration of the Act. Evidently the Administrator did not regard the grounds of adjustment originally provided in the regulation as the last word, for on March 1, 1943, he added to this and other rent regulations an eighth ground for upward revision of maximum rents. 8 F. R. 2674.[2] The reason why Congress required persons affected by regulations to file a protest with the Administrator before seeking review in this court was to enable the Administrator to reconsider the protested regulation in the light of situations, economic data, or arguments brought to his attention by such protest. Thus it was expected, and we understand the expectation has been fulfilled, that many difficulties would be ironed out by administrative action.
*666 The protest, and accompanying affidavit by complainant's president, set forth the following facts:
Complainant is a South Dakota corporation. Its charter and by-laws were adopted in conformity with and as provided by § 207 of Title II of the National Housing Act, 52 Stat. 16, 12 U.S.C.A. § 1713, and the rules and regulations issued thereunder.[3] Complainant owns and operates a rental housing project, consisting of 46 family units, located in Rapid City, South Dakota, which was financed and built under the terms of the National Housing Act. A mortgage of $117,500 was insured by the Federal Housing Administration. The project was worked out in detail with that agency as to plans, specifications, investment per unit, financing, rental scale and all other features. The financial structure and commitments were made so that the project would liquidate itself in approximately 27 years. An initial capital reserve was set up to carry interest and amortization on the loan, taxes, insurance, maintenance costs, operating costs and other expenses, with the plan in mind of meeting all current expenses from the beginning as they became due (together with the inauguration and maintenance of the required reserve funds under the Federal Housing Administration) on as low a rental scale as possible.
The most important factor regarding expenses (in addition to the fixed charges for the retirement of the indebtedness) was the matter of real estate taxes. In this connection consideration was deliberately given to the provision of chapter 264, Session Laws of South Dakota, 1939, exempting new construction from assessment for a period of one year after substantial completion thereof, and to the further provision of South Dakota law that property taxes become due on January 1 following the year of assessment but are not delinquent until May 1 following said year of assessment. Initial steps in the construction of the project were begun in October, 1940, the first units were occupied in February, 1941, the project was not completed until September, 1941, and there was substantial occupancy of the project as a whole in the latter part of 1941. It was estimated that the taxes for the years 1941 and 1942 would average about $700 or $800 per year, and that beginning with the year 1943 such taxes would be approximately $3500 per year. Thus, for the years 1941 and 1942, there would be, by reason of the said tax exemption, a considerable saving in the amount of $60 or $70 per year per family unit.
In accordance with the foregoing, the rental scale for the project was started at $30 per month for the 28 smaller family units and $40 per month for the 18 larger family units, with the plan and intention that sometime during the latter part of 1942 the rental scale would be raised $5 per month per family unit to meet the taxes required to be paid when the exemption ceased to operate. The rent scale initially adopted and subsequently planned (after the tax exemption ceased to operate) was worked out with and approved by the Federal Housing Administration. "It was in effect a rent scale which had no direct relation at the time to the open and free rental market of the property."
The tax assessed on the property for 1941 was $188.72 and for 1942 was $1,053.82, making an average for the two years of $621.27  being very close to the estimate made by complainant as to the tax requirements of the years in question for which said initial rental scale was set. It appears, after consultation with the local tax officials, that for the year 1943 the real estate tax will be the sum of $3,924.74, the tax exemption having expired.
In the affidavit filed by complainant's president a projected operating statement is included, with the 1943 tax assessment at the figure above stated, and based upon the rental scale at which the rentals were frozen by Rent Regulation No. 49 as of March 1, 1942. The items of expenses put *667 down in the operating statement are stated to be substantially the same as in the agreement worked out between complainant and the Federal Housing Administration as a condition of obtaining insurance of the mortgage by this federal agency. According to the operating statement scheduled rental income under the regulation is $19,728 per year, assuming 100% occupancy and collections. The expenses shown are estimated at $20,230.34 annually, including interest and amortization payments on the mortgage as required by the agreement with the Federal Housing Administration, but apparently without any allowance for depreciation. There thus appears to be a resulting deficit of $502.34 with no provision for dividends or income return on the owner's investment of $50,000. Assuming a 5% loss on account of vacancies or rental defaults, this deficit would be increased to $1,488.74.
In a letter annexed to the protest it is stated that since the project was opened for occupancy "many of the rents around town dropped from ten to fifteen dollars a month. Some of these were subsequently raised when the housing situation became acute."
The protest makes specific objection to the section of the regulation providing for adjustments in that it "does not contain a provision allowing for an adjustment in the maximum rents to be charged for housing accommodations when the rent on March 1, 1942, was based upon the fact and existence of a substantial tax exemption which exemption terminated or ceased to exist on or after said date of March 1, 1942."
No hearing on the protest was scheduled and, so far as appears, complainant was not invited to present further evidence in support of the protest.
On December 22, 1942, the Administrator issued his order denying the protest. In an accompanying opinion the Administrator assumes the truth of the facts set forth in the protest, but concludes that complainant failed to set forth a case calling for relief. He stresses the point that real estate taxes have not increased generally in the rental area and that under § 2(b) of the Act he is required to make adjustments on account of increases in property taxes only where such increases are "of general applicability." Further, he argues: "If a particular landlord encounters additional expenses, whether foreseen or unforeseen, he often cannot, in a normal market, offset this by increasing his rents without adversely affecting his competitive position in relation to other landlords. To allow such a landlord to charge higher rents today  rents which he could charge only because of the abnormal pressure for housing created by war efforts  would, in effect, allow him to gain a type of relief and a relative advantage over competing landlords which he might not have had in a normal rental market." Finally, the Administrator objects that the suggested amendment to the adjustment provisions "would endanger the effectiveness of the whole rent control program by creating a formidable administrative burden involving protracted and complicated investigations."
We think that upon the showing made in the protest complainant is entitled to relief. Provision for adjustment can be made for persons in complainant's situation consistently with the general regulatory plan. The rents which complainant was charging on March 1, 1942, were not the product of general market conditions of supply and demand on that date. Landlords generally did not have the advantage of tax exemption, which was available only for a limited period in the case of new construction. Complainant, if it chose (and if the Federal Housing Administration would let it), presumably could have established an initial rental scale on a parity with that generally prevailing in the area. On the other hand, with the competitive advantage which it had over other landlords because of its tax exemption for a limited period, complainant could, and did, establish a rental scale for the earlier months of occupancy which would have been economically unsound if continued beyond the period of tax exemption. That complainant elected to pass on to its tenants this initial tax saving is not a matter requiring the Administrator to delve into complainant's motives; it is a matter susceptible of objective proof by reference to the records of the Federal Housing Administration. The financial plan for amortization of the housing loan, as worked out with the approval of the Federal Housing Administration, contemplated an increase of the rental scale after the period of tax exemption had expired. That plan would not have been "economically sound" as required by the National Housing Act unless the Federal Housing Administration *668 was pretty well assured, when the plan was worked out in 1940, that general market conditions in Rapid City were such that complainant would be able to obtain the contemplated increased rentals after the period of tax exemption had expired; otherwise, sufficient income would not have been in view to meet the estimated carrying charges and the program of amortization. From this it is a fair inference that an increase of complainant's rentals sometime after March 1, 1942, the rent-freezing date, would have been likely in a normal rental market unaffected by war activities. That, as we have seen, is the hypothesis on which the Administrator has based the existing adjustment provisions.
It is not our function to draft amendments to the regulation. Under § 204(a) of the Act we have power only to set aside a regulation or order, in whole or in part, to dismiss the complaint, or to remand the proceeding to the Administrator. We recognize the deference which this court should give to the considered judgment of the Administrator as to the extent to which it is practicable, in the effective administration of the Act, for him to assume the burden of passing on individual applications for adjustment. However, in the case now before us we have no doubt that the Administrator, upon remand, will be able to devise an amendment to the adjustment provisions to cover the situation presented, without laying himself open to an undue administrative burden.
A few words should be added by way of distinguishing the present case from previous decisions of this court. In Wilson and Bennett v. Brown, decided by us July 15, 1943, the protestants sought an amendment of the adjustment provisions so as to permit any landlord as a matter of right to petition for an increase of his maximum rent on the ground that the established maximum rent provided in the regulation, after deducting normal and customary expenses of operation, failed to provide him a net return of at least 6% per annum, based upon the fair market value of the property as of the rent-freezing date. We pointed out that Congress had considered and rejected an amendment to the bill, proposed on the floor of the House, to make such an adjustment provision mandatory; that it would be inconsistent with the maximum rent date method of rent stabilization, which the Administrator was authorized by Congress to adopt; and that there was a rational basis for the judgment of Congress and of the Administrator that such an adjustment provision would be administratively impossible to handle in any nation-wide rent control program. In Lakemore Company v. Brown, decided by us July 15, 1943, the protestant asked the Administrator to amend the adjustment provisions so as to provide for an increase of the maximum rent applicable to an individual property, on the ground that the local authorities had reappraised the particular property and increased its assessed valuation, thereby increasing the owner's real estate taxes. It was alleged that the rentals protestant was receiving on the rent-freezing date were less than rentals being received for comparable accommodations in the same neighborhood. But some variation in the rents for comparable housing accommodations exists in a normal competitive market; the method of freezing rentals as of a given date recognizes such differentials and preserves them. It did not appear in the Lakemore case that the rentals which complainant had in effect on the rent-freezing date were beyond the range of normal variation. So far as appeared, such rents had been established by free bargaining between the Lakemore Company and its tenants in a normal competitive market. Furthermore, there was no reason to suppose that in a normal rental market, undisturbed by the factor of a housing shortage brought about by war activities, complainant would have been enabled to pass on to its tenants, in the form of increased rentals, this increased item of cost to which it was uniquely subjected. For the reasons already indicated the case at bar presents quite a different situation.
The order of December 22, 1942, denying complainant's protest, is set aside and the case is remanded to the Administrator for further proceedings not inconsistent with this opinion.
NOTES
[1] At the argument there was some discussion whether complainant would be entitled to an adjustment under the sixth ground of adjustment provided in the regulation, namely, where the rent on March 1, 1942, was established by lease which provided for a substantially higher rent at other periods during the term of such lease. The tenancies in complainant's apartment building were from month to month. The Administrator has interpreted the adjustment provision just mentioned as being inapplicable to the case of a month to month tenancy, even where there was an understanding that the rent would be increased if the tenant continued to occupy the premises after a particular date.
[2] This provides for an individual adjustment where there has been an increase in the number of occupants over the number contemplated by the rental agreement on the rent-freezing date, where the landlord on that date had a regular and definite practice of fixing different rents for the accommodations for different numbers of occupants.
[3] The act authorizes the Federal Housing Administrator to insure mortgages covering property held by "Private corporations * * * which, until the termination of all obligations of the Administrator under such insurance, are regulated or restricted by the Administrator as to rents or sales, charges, capital structure, rate of return, and methods of operation to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment." It is further provided that no such mortgage shall be accepted for insurance by the Federal Housing Administrator unless he "finds that the property or project, with respect to which the mortgage is executed, is economically sound."