[Nos. A091354, A091361. First Dist., Div. Four. Aug. 31, 2001.]

CONCORD COMMUNITIES, L.P., Plaintiff and Appellant, v.
CITY OF CONCORD, Defendant and Respondent.

COUNSEL

Law Firm of Spangenberg & Ritson, Law Firm of Spangenberg & Associates, Lark R. Ritson and David Spangenberg for Plaintiff and Appellant.

Craig Labadie, City Attorney, Margaret Kotzebue, Deputy City Attorney; Endeman, Lincoln, Turek & Heater, Donald R. Lincoln and Linda B. Reich for Plaintiff and Respondent.

## OPINION

**CHIANTELLI, J.**\*—In action No. A091354 plaintiff and appellant Concord Communities, L.P. (Communities), doing business as Diablo Mobile Lodge, appeals from a judgment of the Contra Costa County Superior Court denying Communities' petition for writ of administrative mandamus and dismissing Communities' cause of action for violation of due process against defendant and respondent City of Concord (City). Similarly, in action No. A091361 plaintiff and appellant Communities, doing business as Adobe Mobile Lodge, appeals an identical judgment.

The appeals arise out of the denial by Concord Rent Review Board (Board) of Communities' requests to adjust the base year rents at its mobilehome parks Diablo Mobile Lodge and Adobe Mobile Lodge. The superior court denied the writ petitions on the ground that the City's administrative decisions were supported by substantial evidence. Communities contends that the base year rents at the Adobe and Diablo parks were significantly below the rents for mobilehome spaces in the City with comparable amenities, because of unique or extraordinary circumstances. We reverse the judgment and remand the matter to the Board for reconsideration.

### BACKGROUND

In August of 1993, Communities entered into a purchase agreement for both Diablo Mobile Lodge and Adobe Mobile Lodge for $1,816,000 and $2,724,000, respectively. Pursuant to the terms of the agreement, Communities made a down payment of $500,000 and obtained a one-year option to close escrow on both parks. Communities' down payment was refundable only if the parks' operating expenses were not as had been represented by the seller. At the time the agreement was entered into, the City had not enacted a mobilehome park rent control ordinance.

In November 1993, Communities noticed a $75 per month per space rent increase at Adobe and a $50 per space increase at Diablo. On January 25, 1994, before the notice periods for the increases were complete, the city council adopted a moratorium on all mobilehome space rent increases.

---

\*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Communities closed escrow on the purchase of the parks in August 1994. On October 25, 1994, while the rent freeze was still in effect, the City enacted Mobilehome Park Rent Stabilization Ordinance No. 94-13 (ordinance), codified as Concord Municipal Code section 4990 et seq., providing for permanent rent regulation.

Pursuant to the ordinance, rents at Adobe and Diablo were forced to reflect the rate charged on January 1, 1994. (Concord Mun. Code, § 4991, subd. B.) The ordinance provided for a general annual adjustment (GAA) of rents once per year at a rate of 60 percent of the consumer price index (CPI) for the year. (*Id.*, § 4994, 2d ¶.) However, the ordinance required a park owner to obtain approval of the Board to obtain a "[s]pecial [r]ent [i]ncrease" in excess of the 60 percent of CPI adjustment. (*Id.*, §§ 4996, 4994.) Furthermore, the ordinance operates under the presumption that the park owner's net operating income (NOI) in the unregulated market of the "base year" (1993) provided it with a "fair and reasonable return." (*Id.*, §§ 5012, 5013.) The ordinance also establishes a base rent adjustment mechanism under which the presumption that the base year NOI provided a "fair and reasonable return" may be rebutted. (*Id.*, § 5015.) Under section 5015, subdivision C, the presumption of a fair and reasonable return based on the base year NOI may be rebutted if "[t]he rents charged by the park owner in the Base Year were significantly below the rents for mobilehome spaces in the City with comparable amenities, because of unique or extraordinary circumstances."

In 1995 the Adobe park earned $3,495 less in gross income than the sum of its operating expenses and debt service, while the Diablo park lost more than $34,000. In April of 1996, Communities noticed a special rent increase at the Adobe park of $146.71 per month per space, and an increase of $102.29 at the Diablo park. At the same time, Communities filed petitions with the City pursuant to the ordinance in order to have the increases approved. (Concord Mun. Code, § 4496.) The Board granted a $34.26 per space maintenance of net operating income (MNOI) rent increase at the Adobe park and a $17.03 per space MNOI rent increase to Diablo as contemplated under the ordinance's GAA of 60 percent of CPI increase. (*Id.*, §§ 5019, 4994.) Communities appealed the Board's decisions and the city council affirmed the Board's decisions.

On May 23, 1997, Communities filed a petition on behalf of each park for a writ of administrative mandate with the Contra Costa County Superior Court challenging the City's decisions. The superior court granted the writs and remanded Communities' petitions for a special rent increase back to the Board based on its finding that "the Board improperly failed to consider and

make findings regarding Petitioner's evidence and argument that challenged the validity of 1993 base year rents as a measure of a fair and reasonable return."

At the remand hearing the Board heard evidence pertaining to whether the 1993 base rents at Adobe and Diablo should be adjusted. Both the City's mobilehome park appraisal expert, James Brabant, as well as Communities' expert appraiser, Gerald C. Taylor, opined that the parks' purchase prices were reasonable and consistent with market indicators and that base rents at Adobe and Diablo were below the base rents of comparable parks. According to Brabant, the average space rent at the Adobe park in 1993 was $312, and the average rent at the Diablo park was $267. Brabant concluded that the space rents for both Adobe and Diablo in the base year were $38 per month lower than those in the City's parks with comparable amenities. Furthermore, Brabant stated that the Adobe and Diablo base year rents were at least 12 to 14 percent lower than comparable rents in the area and that this was a "significant" amount. Taylor also found the difference between the Adobe and Diablo parks' base rents from the rents of parks with comparable amenities to be significant. Taylor was of the opinion that the market value of the space rent at Adobe park in 1993 was $408, which was $91 to $108 more than the rate Adobe was charging tenants at the time. Taylor also stated that the market value of the space rent at the Diablo park in 1993 was $356, which exceeded the amount tenants were actually charged during that year by between $82 and $91. Both Brabant and Taylor opined that the Adobe and Diablo parks were most comparable to Town and Country Mobilehome Park, which was also owned by Communities. In 1993, Town and Country's average space rents were $381, and the high end of the range of rents being charged was $434.

Brabant stated that as per a 1985 market rate study he conducted, which incorporated data and inspections of all the City's parks, the most recent space rent increase had been effective May 1, 1985. The adjustment made at that time totaled 5.7 percent plus $16 per month which had been "a negotiated adjustment to bring the rents closer to a market level." Communities' principal, Richard Hall, testified that base rents in 1993 were significantly below market because the previous owner, Mr. Thompson, built the parks and was free and clear of debt from as early as 1985, had "pre-Proposition 13 taxes" and "didn't want any government involvement." Joe Mitchell, a tenant at the Adobe park, testified that Thompson had told him "he [was] real satisfied with the rents he was charging [and] that's why he didn't increase it." Furthermore, Hall stated that in his opinion the market rent in 1993 for Adobe was $450 per space while Diablo was $350 per space.

The Board found that the space rents in the 1993 base year at Adobe and Diablo were not significantly below the rents for mobilehome parks in the

City with comparable amenities. The Board also determined that Communities failed to establish that its lower rents were due to any "unique or extraordinary circumstances." Therefore the Board denied Communities' requests for base rent increases. Communities appealed to the city council, which affirmed the Board's decisions. Communities then filed a second petition for writ of administrative mandamus for each park.

The superior court entered judgments denying Communities' writ petitions. It held that there was no substantial evidence in the record to support the Board's finding that rents at Adobe and Diablo were not significantly below the rents for mobilehome space in the City's parks with comparable amenities. However, the superior court also found that despite the fact that the prior owner owned the land free and clear of debt and raised rents according to his own personal criteria rather than based on market prices, Communities had failed to show that the low rents were caused by "unique or extraordinary circumstances." Furthermore, the superior court held that the words "unique or extraordinary" within the ordinance call for a totally subjective determination by the Board.

DISCUSSION

## I. Standard of Review

We commence our analysis with a statement of the appropriate standard of review since the parties disagree as to what standard of review governs their dispute. ▉ On appeal from a writ of administrative mandamus an appellate court must determine whether the decision of an administrative agency will substantially affect "vested, fundamental rights." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242].) When the administrative decision neither involves nor substantially affects such a right, the trial court must review the whole administrative record to determine whether the findings are supported by substantial evidence and whether the agency committed any errors of law. (*Id.* at p. 144.)

▉ "[I]f a rent control commission renders a decision denying a just and reasonable return on property, the decision involves an unconstitutional deprivation of a property right." (*San Marcos Mobilehome Park Owners' Assn. v. City of San Marcos* (1987) 192 Cal.App.3d 1492, 1501 [238 Cal.Rptr. 290].) "However, the possible constitutional invalidity of the administrative decision does not mean that every time a rent control board evaluates a particular proposed rent increase, it is deciding an owner's fundamental rights." (*Ibid.*, italics omitted.) When determining what rights are fundamental for administrative review purposes, the court must determine if the right fundamentally affects the life situation of the individual to

require independent review or whether it merely impacts an area of economic privilege in a less than fundamental manner. (See *Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 395-398 [188 Cal.Rptr. 891, 657 P.2d 383].)

"In analyzing the fundamental nature of the right asserted, [the] court[] manifest[s] slighter sensitivity to the preservation of purely economic privileges . . . ." (*Bixby v. Pierno, supra,* 4 Cal.3d at p. 145.) ■ The requested rent increases fall into the less sensitive category of the " 'preservation of purely economic privileges' " that do not substantially and fundamentally impact the individual. (*San Marcos Mobilehome Park Owners' Assn. v. City of San Marcos, supra,* 192 Cal.App.3d at p. 1500.) A substantial evidence standard is proper when reviewing the decision of a rent control board because the owner's proposed rent increases do not involve an administrative decision which substantially affects fundamental rights. (*Ibid.*) "Merely deciding that the standard is 'substantial evidence,' however, is not sufficient to end the inquiry, because '[a]pplication of the test inherently requires that the reviewing court first determine the question, "Substantial evidence of what?" ' " (*Westwinds Mobile Home Park v. Mobilehome Park Rental Review Bd.* (1994) 30 Cal.App.4th 84, 90 [35 Cal.Rptr.2d 315], quoting *Yee v. Mobilehome Park Rental Review Bd.* (1993) 17 Cal.App.4th 1097, 1106 [23 Cal.Rptr.2d 1].)

Therefore, the issue presented is whether the Board's decisions not to adjust Communities' 1993 base year rent at the Adobe and Diablo parks was supported by substantial evidence that could give rise to the conclusion that Communities was receiving a fair rate of return on its equity investment.

II. *Base Year Rents Were Significantly Below Market Value*

■ City contends that "there was substantial evidence that the parks' base year rents were not 'significantly below' comparable rents." This contention lacks merit.

■ Price controls on rent are within the City's police power if they are reasonably calculated both to eliminate excessive rents and to provide the owner with a "just and reasonable" return on its property. (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001].) The critical questions are not whether the base date rents establish a fair and reasonable return and whether the base date rents are within a range of rents which can be charged. Rather the question is whether the base date rents can reasonably be deemed to reflect general market conditions. (*Vega v. City of West Hollywood* (1990) 223 Cal.App.3d 1342, 1351 [273 Cal.Rptr. 243].)

After base date rents are established which reflect general market conditions, the rents which are then established must provide the landlord with the requisite just and reasonable return. (*Ibid.*) "[A] property owner must be permitted, pursuant to the principles discussed in *Birkenfeld . . .* , to start rent calculations with a base date rent similar to other comparable properties." (*Id.* at p. 1352.)

" '[T]o be "just and reasonable" a rate of return must be high enough to encourage good management including adequate maintenance of services, to furnish a reward for efficiency, to discourage the flight of capital from the rental housing market, and to enable operators to maintain and support their credit.' " (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside* (1984) 157 Cal.App.3d 887, 907 [204 Cal.Rptr. 239].) A just and reasonable return is one which is generally commensurate with returns on investments in other enterprises having corresponding risks. On the other hand, it is also one which is not so high as to defeat the purposes of rent control and excessive rents. (*Ibid.*) "[A]lthough a fixed profit amount may produce a reasonable or fair return on investment for low-risk investments such as bonds, [an] investment in rental units contemplates a higher risk and hence, in times of high inflation and when viewed in the long term, demands more than mere maintenance of an existing profit amount." (*Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 683 [209 Cal.Rptr. 682, 693 P.2d 261].) However, "[s]ome lessening of appreciation is a necessary consequence of any rent control, since future appreciation is to a significant extent a function of increased rental income." (*Cotati Alliance for Better Housing v. City of Cotati* (1983) 148 Cal.App.3d 280, 290 [195 Cal.Rptr. 825].) The fact that the value of the property is reduced does not mean that the regulation is invalid. (*Penn. Central Transp. Co. v. New York City* (1978) 438 U.S. 104, 131 [98 S.Ct. 2646, 2662-2663, 57 L.Ed.2d 631] [diminution in property value, standing alone, cannot establish a "taking"].)

The superior court correctly held that the Board's determination that the base rents at Diablo and Adobe were not significantly low was not supported by substantial evidence. In fact, there is no evidence in the proceedings before the Board from which it could have concluded that the base rents at the two parks were anything but significantly below market value. Both the City's expert as well as Communities' effectively stated that the base rents at Diablo and Adobe were at least 12 to 14 percent below rents for mobilehome spaces with comparable amenities and both concluded that this percentage was significant. As the superior court stated, "[t]here is no conflicting evidence in the record." Communities correctly points out that none of the Board's members were technically qualified to dispute the conclusions of the City's and Communities' expert appraisers.

In *Whispering Pines Mobile Home Park, Ltd. v. City of Scotts Valley* (1986) 180 Cal.App.3d 152, 158-159 [225 Cal.Rptr. 364], the only evidence before the rent control commission as to what constituted a fair rate of return was the testimony of an expert who compared the expected return on a mobile-home park to that expected on utility stocks and concluded that 9 percent was the absolute minimum rate of return which was fair or adequate for investment in such a park. The commission and the trial court disregarded the expert on the basis of the experience and knowledge of members of the commission in local real estate matters. (*Id.* at p. 159.) Thereafter, the appellate court granted the landowners' writ of mandate (*id.* at p. 163) and held that it was "a matter of expert opinion what rate of return on a mobilehome park is fair." (*Id.* at pp. 160-161.) Similarly, the City's Board ignored the testimony of both experts and failed to recognize any authority upon which their conclusions were based. Thus, the Board's determination as to the threshold of "significantly below fair market rates" could only have been premised upon personal experience and knowledge of real estate.

Similarly, in *Yee v. Mobilehome Park Rental Review Bd., supra,* 17 Cal.App.4th at pages 1109-1110, the court held that the board's award of a base year rent increase that resulted in a 4.2 percent return on investment was not substantively supported because there was no evidence that like investments involving similar risks, with similar capital appreciation and tax benefits to the owners produced similar returns. Thus, there was no evidence that a 4.2 percent return on investment was a fair return. By the same token, there was no evidence that even after the GAA adjustment, Communities' 4 percent return at the Adobe park or its -1 percent return at the Diablo park was a fair return on its investment.

III.   "*[U]nique or [E]xtraordinary [C]ircumstances*"

Communities contends that the low base year rents were caused by "unique or extraordinary circumstances." This contention has merit.

Pursuant to the ordinance, to rebut the presumption that the base year NOI provided the owner with a fair and reasonable return, the owner must prove that the base year rent was significantly below the rents for mobilehome spaces in the City, "because of unique or extraordinary circumstances." (Concord Mun. Code, § 5015, subd. C.) The superior court found that facts constituting "unique or extraordinary circumstances" called for a subjective determination to be made by the Board. The superior court found this subjective standard "troublesome" because "[i]t [could] mean anything" and was "amorphous." However, the superior court reviewed the Board's decision as petitions for writs of administrative mandamus. This type of writ petition is governed by Code of Civil Procedure section 1094.5.

Subdivision (b) of Code of Civil Procedure section 1094.5 sets forth that "prejudicial abuse of discretion" is the standard by which courts should review a final administrative order. The statute further states that "[a]buse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*) Abuse of discretion has at least two components: a factual component that is governed by a standard such that the substantial evidence must support the court's findings and a legal component. (*Quackenbush v. Mission Ins. Co.* (1996) 46 Cal.App.4th 458, 466 [54 Cal.Rptr.2d 112].) This legal component of discretion was best explained long ago in *Bailey v. Taaffe* (1866) 29 Cal. 422, 424: "The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. In a plain case this discretion has no office to perform, and its exercise is limited to doubtful cases, where an impartial mind hesitates." Therefore, the trial court erred in determining that "unique or extraordinary circumstances" was a purely subjective standard to be determined by the Board that could "mean anything."

"[U]nique or extraordinary circumstances" has been defined by the relevant case law. Based on a similar ordinance, *Vega v. City of West Hollywood, supra,* 223 Cal.App.3d 1342, is instructive. In *Vega* the court found that "peculiar circumstances" justified an adjustment in base year rents because the 84-year-old owner of a nine-unit apartment building kept rents "significantly below" the rents charged for comparable space in the area. The owner had built the property 40 years earlier and five of the units were occupied by long-term elderly tenants who accepted responsibility for the majority of the maintenance on their units with the understanding that the owner would keep their rents low. The owner's last rent increase for some of the units was 15 to 20 years earlier. (*Id.* at p. 1344.) Similarly, the previous owner of Diablo and Adobe built the parks in 1958 and 1970, respectively, was free and clear of debt from as early as 1985, and had not raised rents in a consequential manner since 1985.[1] A tenant at the Adobe park stated that the previous owner told him that "he [was] real satisfied with the rents he

---

[1]City's contention that this was "anecdotal hearsay" by Hall is without merit since there was no timely objection made and because our finding is not based upon this testimony alone. (Gov. Code, § 11513, subd. (d); *Borror v. Department of Investment* (1971) 15 Cal.App.3d 531, 546 [92 Cal.Rptr. 525] [hearsay in administrative proceedings, admitted without objection, is sufficient in itself to support a finding unless there is some evidence, admissible in such proceedings, to the contrary; such hearsay evidence, unless objected to, serves to shift the burden of producing evidence of the existence or nonexistence of the facts disclosed].)

was charging [and] that's why he didn't increase it." Furthermore, in the ordinance's purpose and findings itself, the City acknowledges that "[a] substantial portion of the residents in mobilehome parks in the City are senior citizens . . . ." (Concord Mun. Code, § 4990, subd. L.) Thus, the present situation is highly analogous to that in *Vega*.

The circumstances surrounding the previous owner of Diablo and Adobe become even more extraordinary in light of the fact that he had pre-Proposition 13 taxes and did not want any government involvement, thus justifying rents being significantly below market value. In *Hillcrest Terrace Corporation v. Brown* (Emer.Ct.App. 1943) 137 F.2d 663, 666-667, the court held that the landowner was entitled to a base rent increase after the imposition of the Emergency Price Control Act of 1942 due to the circumstance that a tax code provision exempted new construction from taxes for a period of one year after completion which was, in turn, passed on to tenants in the form of low rents and ultimately became the base year under the existing rent control scheme. While the court made no mention of the tax exemption constituting "unique or extraordinary circumstances," its finding was centered on the fact that under a rent control regulation there is an assumption that the base rent reflected levels "which landlords and tenants had worked out for themselves by free bargaining in a competitive market . . . ." (*Id.* at p. 664.) Certainly a landlord such as that prior to the sale to Communities, who chooses not to maximize earnings from potential rents, is unique based on the assumptions set forth in *Hillcrest* that rent-freezing dates are the byproduct of "general market conditions of supply and demand on that date." (*Ibid.*)

Communities' timing in its purchase of the Diablo and Adobe parks also cannot be ignored in the context of contributing to "unique or extraordinary circumstances." Communities entered into the purchase agreement for the parks in August of 1993 whereby its down payment was not refundable unless operating expenses were misrepresented by the seller. In November of 1993, Communities noticed a $75 increase at Adobe and a $50 increase at Diablo. In response to the noticed increases, the city council placed a moratorium on mobilehome rent increases in January of 1994 and enacted permanent rent control in October of 1994 while the rent freeze was still in effect. Thus, Communities never had the opportunity to place rents at a level that "reflected general market conditions" and was forced to accept rents at prices set by the previous owner which were "significantly below rents for mobilehome spaces in the City with comparable amenities." In *Apartment Assn. of Greater L.A. v. Santa Monica Rent Control Bd.* (1994) 24 Cal.App.4th 1730, 1732-1733 [30 Cal.Rptr.2d 228], the court held that a rent control ordinance was invalid on its face because it failed to allow a

landowner who purchased the regulated land *after* the imposition of rent control to seek a base year adjustment. The court distinguished *Vega* and *Birkenfeld* on the ground that both of those cases "depended on the existence of circumstances that prevented the base rent from reflecting market conditions." (*Id.* at pp. 1736-1737.) Therefore, Communities' timing in its purchase of the properties coupled with the previous owner's lack of financial obligations make the circumstances surrounding the significantly low base year rents "unique or extraordinary."

City's argument that "unique or extraordinary circumstances" must conform exactly to those factual scenarios set forth in *Birkenfeld* and *Vega,* fails to recognize that those situations served merely as indicia of the type of circumstance that could rise to a level which could be labeled "unique or extraordinary," and did not purport to be exhaustive lists. In *Birkenfeld,* while evaluating the facial validity of a rent control ordinance, the court stated there could be "*factors* that might have prevented the base rent from reflecting general market conditions *such as* seasonal fluctuation in the demand for the kind of housing involved or the existence of a special relationship between landlord and tenant resulting in an undercharging of rent." (*Birkenfeld v. City of Berkeley, supra,* 17 Cal.3d at p. 168, italics added; cf. *Hillcrest Terrace Corporation v. Brown, supra,* 137 F.2d at p. 665.) After discussing these illustrative situations, the *Hillcrest* court noted that "[t]he general pattern of these adjustment provisions is . . . that they permit an individual increase of rents in those limited classes of cases where experience has shown that an increase after the rent-freezing date would have been likely in a normal market even in the absence of a housing shortage . . . ." (*Hillcrest Terrace Corporation v. Brown, supra,* 137 F.2d at p. 665.) Furthermore, the *Vega* court noted that one of two ways rent ceilings are confiscatory and unconstitutional is when no adjustment mechanism exists for " '*situations* in which the base rent cannot reasonably be deemed to reflect general market conditions.' " (*Vega v. City of West Hollywood, supra,* 223 Cal.App.3d at p. 1349, italics added.)

When base date rents can be adjusted to reflect prevailing rents for comparable units, everyone within the ambit of the rent control scheme participates on equal footing. (*Vega v. City of West Hollywood, supra,* 223 Cal.App.3d at p. 1349.) However, when base date rents are significantly below market value due to "unique or extraordinary circumstances," the balance tips and tenants become beneficiaries of a windfall in perpetuity.

While the City's ordinance properly seeks to maintain the same rate of return which property owners experienced prior to the enactment of rent control with adjustments for inflation, a property owner must be permitted to

start rent calculations with a base date rent similar to comparable properties. (*Vega v. City of West Hollywood, supra,* 223 Cal.App.3d at p. 1352.) We find that the circumstances surrounding Communities' purchase of the Adobe and Diablo parks provide "unique or extraordinary circumstances" with the same vigor as contemplated by *Hillcrest* and its progeny.

## DISPOSITION

We reverse the judgments of the trial court and direct entry of judgments granting Communities' writs of mandate compelling the Board to vacate its decisions and reconsider what a fair return on investment would be. The Board in its discretion may take additional evidence or rely on the existing evidence, consistent with this opinion.

Reardon, Acting P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied September 6, 2001, and respondent's petition for review by the Supreme Court was denied December 19, 2001.