Filed 4/23/21  P. v. Ceballos CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ANDREW CEBALLOS,<br><br>　　　Defendant and Appellant. | A158314<br><br>(Solano County<br>Super. Ct. No. VCR221474)<br><br>ORDER MODIFYING OPINION |

BY THE COURT:

　　　The opinion filed herein on March 24, 2021, is modified as follows.

　　　On page 19, the second sentence in the first full paragraph is modified to read:

As to the other arguments, the People assert that at least two of them, arguments two (equal protection) and three (denial of *Romero* motion) were waived, as the arguments could have been made in the first appeal.

　　　This modification does not effect a change in the judgment.

Date: 4/23/21　　　　　　　　　　　　　_____

　　　　　　　　　　　　　　　　　　　　Kline, P.J.

1

Filed 3/24/21  P. v. Ceballos CA1/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ANDREW CEBALLOS, Defendant and Appellant. | A158314 (Solano County Super. Ct. No. VCR221474) |

Defendant Andrew Ceballos was convicted of second degree murder and assault with a semiautomatic firearm after he fired eight shots through the closed door of a crowded bedroom, killing one of the five people inside. Defendant appealed, and in August 2018, we affirmed the judgment of conviction.  But, based on a change in the law, we remanded the case "for the sole purpose of allowing the trial court to exercise its discretion under subdivision (h) of [Penal Code] section 12022.53" whether to strike the 25-year enhancement imposed for personal use of a firearm.

Prior to resentencing, defendant filed a sentencing memorandum that raised additional claims attacking his sentence, claims not even responded to in the People's opposition memorandum.  The trial court declined to strike the enhancement.  And as to defendant's additional claims, the trial court

1

noted they had already been decided and rejected on appeal, and, even if it were to consider the claims, it would deny them on the merits.

Defendant appeals again, contending the trial court abused its discretion in refusing to strike the personal use enhancement. In addition, defendant makes five other arguments, two of which are identical to arguments rejected in his first appeal. He has also filed a petition for writ of habeas corpus, claiming that his trial counsel rendered ineffective assistance in various ways. The petition also asserts arguments rejected in his prior appeal, and others that are identical to his claims on appeal.

We conclude that only two claims of error are properly before us on appeal: (1) the refusal to strike the gun enhancement and (2) the imposition of a restitution fine. As to the first, we remand to the trial court once again, to exercise its discretion in light of all applicable legal principles. As to the second, we affirm. And as to the habeas corpus petition, we issue an order to show cause returnable in the trial court, in effect transferring the petition there, a transfer agreed to by both sides.

## BACKGROUND

**The Facts**

The victim, Willie Troy Johnson (Troy, sometimes called T-Roy) was killed on July 14, 2014 in the home of defendant's mother Judith Williams. These are the facts leading to the killing.[1]

Twenty-four-year-old defendant and his three-year-old daughter were living with Williams and her boyfriend, Major Carter, in Williams's small, one-bedroom home in Vallejo, having moved in about three months earlier.

---

[1] We granted defendant's motion to augment the record with the record in the first appeal, No. A148521.

2

Williams and Carter slept in the bedroom, and defendant and his daughter in the living room, where defendant slept on the couch. The home was a "trap house" where people would use or buy heroin.

A day or so before July 14, defendant had an argument with Carter, defendant believing that Carter was cheating on his mother by having an affair. Defendant punched Carter numerous times, leaving his face swollen and with two black eyes. Defendant claimed that after the beating his mother told him he had to move out.

On the night before July 14, several people besides Williams were at her house, including defendant, his daughter, Terrance Woods (a friend of Williams and Carter), Troy, and his son Tynez Johnson. Woods heard defendant arguing with his mother about having to leave the house, following which argument defendant left the house, not to return that night. Shortly after defendant left, Woods, Troy, and Tynez also left. Troy returned later that evening and Tynez even later, joining his father to sleep in the living room.

Sometime the next morning, defendant returned to the house, and then left again for a few hours, asking Troy to watch his daughter.[2] At that point, Williams, Carter, Troy, Woods, Tynez and defendant's daughter were at the house. Sometime that morning, Williams made pancakes for everyone, and they ate together in the bedroom. And the five adults spent the next few hours together in the bedroom watching movies on television.[3]

---

[2] It is not clear exactly when defendant left, but Tynez remembered that defendant was there when he woke up.

[3] The bedroom was a square, measuring nine feet, ten inches on each side. The width of the bedroom door was two feet, eight inches.

Defendant returned to the house after a few hours, estimating he arrived around 11:30 or noon. With the others still in the bedroom, defendant lay down on the living room couch and went to sleep.

Williams, who had been sitting on the bed with Carter, left the bedroom to do dishes and then make a phone call. To remain shut, the bedroom door had to be latched from inside, and when Williams left the room, Troy, who was closest to the door, latched it shut.

Sometime between 1:00 and 2:00 p.m., defendant's former girlfriend, Aqua Vincent, came by the house, driven by her friend Kayla Reed. Vincent and Reed had come from a doctor's appointment for Vincent's newborn baby, who was defendant's son, and had gone to Williams's house "to pick up money from defendant."[4] Reed and the baby stayed in the car in the alley outside the house, while Vincent went into the house where she saw defendant asleep on the couch. Vincent tried to wake him up, without success, and went back outside, where Williams was now sitting in the car with the baby. When Vincent told Williams that defendant would not wake up, Williams said she would try to wake him up, to which Vincent responded, "Good luck."

Defendant became angry after his mother woke him up and they began to argue. According to defendant, his mother told him that she and Carter had decided that he could not live there but would not tell him why he had to leave.

Around the same time, Jami Schooler was in the house to "get some dope." When she arrived, defendant was asleep on the couch, Williams was in the kitchen, and Carter, Woods, Troy, and Tynez were in the bedroom.

---

[4] Defendant and his daughter had lived with Vincent for nine months before they severed their relationship and defendant moved in with his mother.

About the time Schooler was going to leave, she saw defendant and his mother arguing in the kitchen. She then saw defendant go into the living room and return with a gun that he put in the waistband of his pants. Schooler decided it was time to leave, went outside, and began to walk away, when she heard gunshots.

Before the shooting, defendant had gone outside to the driver's side of Reed's car and asked Vincent to take him to the store. Vincent refused, saying she did not have time for that. Williams had followed him outside and stood on the porch, continuing to argue with him about Carter and telling him she wanted him and his daughter out of the house. Like Schooler, Vincent also decided she did not want to stay, and she told police she heard Williams say something like "shoot me or put that thing away." Vincent and Reed began to drive away, and moments later heard gunshots.

Just before the shooting, Tynez and Woods heard defendant and his mother arguing loudly outside the bedroom, being able to hear over the sound of the television. Then, after the shouting ended, defendant fired at least eight bullets into the bedroom, primarily through the door. After the first shot, Tynez, Troy, and Woods dove to the ground, and Carter backed himself against the wall. Troy was hit by one of the bullets and within minutes died of a gunshot wound that entered his left chest, passed through his heart, stomach, and liver, and exited his abdomen.[5]

After the shooting, Tynez and Woods immediately went to provide aid to Troy. Soon after, the latched door was "kicked open[]," and Williams ran into the bedroom followed by defendant. Tynez heard defendant say "T-Roy,"

---

[5] Police later recovered four casings from a nine-millimeter semiautomatic, and identified seven bullet holes in the bedroom door that "spanned from the bottom to the top of the door" and an additional bullet hole in the frame to the left of the door.

and thought defendant seemed surprised he had shot Troy.  Woods said that defendant, while still holding the gun, said, "Oh, my God" and "What the fuck have I done?"  With the gun still in his hand, defendant left the house, went to a friend's house, and called Vincent, telling her he was sorry.

Defendant was found by police and arrested two weeks later.  During an interview with police, he denied that he was present at the shooting.

**The Proceedings Below**

On December 1, 2014, the district attorney filed an information charging defendant with two counts:  in count 1, with murder, and alleging enhancements for discharge of a firearm resulting in death, discharge of a firearm, and personal use of a firearm.  (Pen. Code, §§ 187, subd. (a), 12022.53, subds. (b), (c), (d), 12022.5, subd. (a)(1))[6]; and in count 2, with assault with a semiautomatic firearm, and alleging an enhancement for personal use of a firearm (§§ 245, subd. (b), 12022.5, subd. (a)(1)).  The information also alleged a prior juvenile adjudication for robbery as a strike offense.  (§ 667, subds.(a)(1), (b), 1170.12, subds. (a)–(d).)

Following a seven-day trial,  a jury found defendant guilty of the charges and found true the firearm enhancements.  Defendant waived jury trial of his prior offenses, and on August 21, 2015, the trial court found true a prior robbery, which was both a serious felony and a strike offense.

On May 9, 2016, the trial court denied defendant's motion for new trial and his *Romero* motion to dismiss his strike offense.[7]  Doing so, the court was aware that defendant committed his strike offense as a juvenile, but nonetheless found that he did not fall outside the spirit of the Three Strikes sentencing scheme.  The trial court noted that defendant had a long and

---

[6] All statutory references are to the Penal Code unless noted.

[7] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 504.

6

continuous history of offenses and that he committed the present offense, second degree murder, shortly after his release from California Youth Authority (CYA) where he had served 76 months for the strike offense robbery.

The trial court sentenced defendant to an aggregate term of 55 years to life: a principal term of 30 years to life (15 years to life doubled by the prior strike) for second degree murder and a consecutive 25 years to life term on the firearm enhancement in count 1; concurrent high terms for the assault offense (nine years, doubled to 18 years by the prior strike offense) and the firearm enhancement (10 years) in count 2, punishment for which was stayed under section 654.

Defendant appealed.

**The First Appeal**

In his first appeal, represented by attorney Laura Kelly, the attorney who represents him here, defendant filed a 118-page opening brief that had five arguments: (1) discriminatory exercise of peremptory challenges in violation of *Batson/Wheeler*[8]; (2) insufficiency of the evidence for the assault conviction; (3) prosecutorial misconduct in closing argument; (4) the sentence violated the Eighth Amendment and section 17 of the California Constitution; and (5) use of a juvenile adjudication as a strike violated defendant's right to jury trial. On August 2, 2018, we filed our unpublished opinion rejecting all five arguments.

During the pendency of the appeal, the Governor signed Senate Bill No. 620, effective January 1, 2018, which amended section 12022.53 to give the trial court the authority to strike in the interests of justice a firearm

---

[8] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

enhancement allegation found true under that statute. (Stats. 2017, ch. 682, § 2.) In supplemental briefing, defendant asserted that the amendment applied to him because his case was not yet final, and that the matter had to be remanded to afford the trial court the opportunity to exercise its discretion to strike the firearm enhancement that was no longer mandatory under section 12022.53.

In the concluding three paragraphs of our opinion, we addressed defendant's claim:

"The Attorney General does not contest most of defendant's reasoning. But he does believe that comments made by the trial court at the time of sentencing establish that it would not exercise its new discretion in defendant's favor. The Attorney General's logic is not sufficiently persuasive.

"As the Attorney General points out, at the time of sentencing the court denied defendant's motion to strike his juvenile prior in accordance with *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, concluding: 'From his juvenile probation, he had an opportunity to rehabilitate himself or seek some sort of rehabilitation. His crimes continued, undeterred. Also, he had a lengthy 76-month term at CYA. That did not deter him from continued criminal conduct as an adult. [¶] So for those reasons, in terms of applying the applicable law here, the *Romero* motion is denied.'

"Still, we cannot agree that remand would be an idle act as a matter of law. The court 'recognize[d] that the defendant did not intend to kill this particular victim.' And it ran the sentence on the assault conviction concurrently with the murder sentence. It may not be likely that the court will give defendant another break, but it may. At bottom, this court feels a deep reluctance to assume that it knows how a trial court would have

8

exercised a discretion it did not know it possessed.  In short, we are loathe to put words in the trial court's mouth."

And with that, we set forth our disposition:  "The cause is remanded for the sole purpose of allowing the trial court to exercise its discretion under subdivision (h) of section 12022.53.  The judgment of conviction is affirmed in all other respects."

**Resentencing**

The resentencing came on for hearing on August 30, 2019, before the Honorable Tim Kam, the same judge who had presided over defendant's trial and sentencing.  Defendant was represented by attorney Dustin Gordon, the People by Deputy District Attorney Paul Sequeira.

Prior to the resentencing hearing, Mr. Gordon filed on behalf of defendant a sentencing memorandum that inclusive of exhibits was 25 pages long.  Despite the limited nature of our remand, the sentencing memorandum contained four arguments:  (1) the court should strike defendant's prior juvenile robbery adjudication pursuant to section 1385 because his prior juvenile strike does not warrant him being denied eligibility for relief pursuant to section 3051; (2) the limitation contained in section 3051, subdivision (h) prohibiting youthful offenders who have a prior juvenile strike from receiving relief violates the equal protection clause of the United States and California Constitutions; (3) the court should strike the gun enhancements "due to [defendant's] age and the fact that he did not intend to kill anyone"; and (4) defendant's sentence amounts to cruel and unusual punishment.  The fourth argument had been specifically rejected in our opinion, although the argument, which we described as "pro forma," had not been fashioned in light of section 3051.

9

Defendant's sentencing memorandum also referred to the 2008 offense, for which defendant was adjudicated. And it also acknowledged this other activity: "Other than the juvenile robbery conviction [defendant] had two residential burglary adjudications that were sustained, both when he was 13 years old. It appeared he also had a juvenile petition when he was 16 years old for violations of Penal Code sections 459, 496, and 243[, subdivision] (d)(1). [¶] The only adult conviction was a felony hit and run, which [defendant] was pending sentencing at the time of his instant offense."

Then, after quoting the Penal Code section that caused our remand, the sentencing memorandum asserted this:

"In the instant action the interests of justice favor striking the personal use enhancements which will allow the court to fashion a more appropriate sentence. In the instant action it is undisputed that [defendant] did not intend to kill anyone. Yet the sentence that was previously imposed, 55 years to life is tantamount to a sentence of life in prison without parole considering that [defendant] will not be eligible for parole until he is 79-years-old. A sentence of life in prison without parole is not warranted in a case where the defendant did not have the intent to kill anyone.

"[Defendant]'s criminal history does not indicate that he is beyond rehabilitation. His only other adult conviction is for a hit and run. His father has turned his life around and has reconnected to [defendant]. [Citation.] He has family that supports him and he has two kids that he hopes to see one day when he is not in custody. Moreover, [defendant] recognizes that his own choices and poor decisions have put him in this situation. [Citation.]"

Defendant's sentencing memorandum also cited to *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*.)

The district attorney filed a very brief opposition, responding only to the third argument, seeking to strike the gun enhancement. The opposition focused on defendant's criminal history as a juvenile, and in its concluding five-line argument—entitled "The Defendant's Character and Prospects Dictate The Gun Enhancement Not Be Stricken"—asserted that "defendant is a reckless, violent killer. . . . [I]t appears likely that defendant will kill again. The defendant presents an extreme danger to society. The imposition of the gun enhancement . . . is just and appropriate." Nothing was said about defendant's age, or any factors relating to it, nor was anything said about section 3051. And the district attorney did not address, much less dispute, the fact that the firearm enhancement meant that defendant would not be eligible for parole until he was 79 years old.

Defendant filed a reply to the opposition, responding to the gun enhancement argument, and also reiterating arguments that the use of the prior juvenile adjudication to enhance his sentence violates defendant's rights "under the Fifth, Sixth and Fourteenth Amendments." And as particularly apt here, defendant's reply said this: "In contrast the stated purpose of Senate Bill 620 is to allow courts to strike the gun enhancements when it would serve the 'interests of justice.' (See Penal Code section 12022.53 (g).) Senate Bill 620 has given the courts discretion that they did not have prior to the passage of the law. Thus, unlike the three strikes law which was passed to enhance punishments for repeat offenders, Senate Bill 620 was passed to give courts discretion to impose a lesser sentence when it satisfied the interests of justice. Additionally, the passage of Senate Bill 620 cannot be viewed in a vacuum. Over the past eight years several laws have been passed which have lessened punishment, i.e., the realignment act (allowing 'prison' sentences for some crimes to be served at county jail and on

11

supervised release), Proposition 47 (which reclassified certain crimes from felonies to misdemeanors and allowed courts to resentence some people given a third strike sentence), Senate Bill 180 (otherwise known as the 'RISE Act' repealing three-year drug priors), and Senate Bill 1437 (abolishing the felony-murder rule in certain circumstances). It is against this backdrop that the court should take into consideration the practical impact of not striking the gun enhancement.

"As stated in defendant's sentencing memorandum a sentence of 55 years to life is tantamount to a sentence of life without parole for [defendant]. For someone as young as [defendant], where there was no intent to kill, there should be a chance at redemption."

The hearing on August 30 began with the court noting its "new discretion under the law," and also advising counsel that it had read both parties' resentencing materials, including the letters submitted on behalf of defendant. The court then asked Mr. Gordon if he had any additional comments, who then spent the next several pages in the reporter's transcript on issues unrelated to our remand, first noting that the "People's brief didn't address my *Romero* argument for the constitutional argument" and then proceeding to the equal protection claim. Mr. Gordon then turned to the argument about striking the enhancement, which he argued for three more pages, in the course of which he said this:

"Senate Bill 620 expanded or enhanced the court's discretion, so I think when the court is looking at whether it should exercise that discretion under the newly passed law, I don't think the mere fact the court chose not to strike the strike previously, I don't think that carries the day with the analysis here because it's different. I mean the standard is the further justice or interest of justice, which is the underlying standard for [Penal Code section] 1385, it's

12

somewhat informed by the discretion the court is granting. So in the *Romero* situation when the court is choosing whether to exercise discretion under [Penal Code section] 1385, kind of guiding the court's discretion is does [defendant] fall outside the spirit of the three strikes law. That same analysis does not apply here when the court is considering whether to strike the gun enhancement.

"I think the court's discretion is much broader, and the court's consideration of the factors is much broader. What I mean by that, it dovetails what I would say is the theme of my brief. The current sentence for [defendant] does not provide a meaningful opportunity to be released, and I think when you consider the state of the law how things have changed over the past seven to eight years, I would say you consider the youthful offender statute the reason why that law was passed and this law was passed, it would be well within the court's discretion to strike the gun enhancement. Even if the court only made that decision, not getting into my other argument, [defendant] has a sentence of 30 to life. Again, that means he just has the opportunity to be paroled."

Deputy District Attorney Sequeira responded briefly, followed by brief reply by Mr. Gordon, who reiterated he thought his other arguments were properly before the court. Following that, defendant apologized to the victim's family and told the court he regretted his actions.

The court announced that it appreciated and considered the arguments from both sides, and then said this: "I recognize where I have discretion. The court has given me new discretion, and the arguments you make, Mr. Gordon, are, one, to strike the juvenile strike. I conducted the *Romero* motion previously, but you're asking me to reconsider *Romero* in light of the youthful offender act. You're asking me to look at the equal protection side of 3051 PC

13

in the context you stated it, and you're asking me to look at the issue of whether juvenile strike is a valid strike. That issue is on review to the U.S. Supreme Court."

Mr. Gordon briefly acknowledged that "The *Nguyen* decision is 2009.[9] It's ten years ago. I don't disagree with Mr. Sequeira at all. It's settled law."

And then the court announced its decision: "Those are the issues you're asking me to look at in this context. At this point applying the law to this case and understanding I have discretion I am going to deny that request. I think Mr. Sequeira raises a very good point. We often do forget about those who have been left behind, but you know my *Romero* factors. I listed those previously in terms of his prior conviction as a juvenile. There [were] other incidents if I recall. I did re-read the Court of Appeal opinion and saw the comments that I made, so I'll stand by those. Considering the facts of this case, I'll be pointing those out a little later here as well. They do not warrant striking the strike, and my analysis under *Romero* has not changed in light of PC 3051 referencing now someone under 25 their brains are not fully developed. Looking at that picture to the extent I can consider this issue given it was not remanded for this issue, I would still deny it. I'm not sure this issue is properly before the court as it was not sent back on remand. If it is, I still decline to strike the strike here in light of the previous history, just the underlying facts of this case.

"I recognize [defendant] had a very tragic childhood as laid out in the paperwork here. In my view it would not warrant striking the juvenile strike. In terms of the equal protection argument and addressing the *Nguyen* issues, again, those are not remanded to the trial court for those issues. Technically I don't think they are before me. It they are, I'm denying it as

---

[9] *People v. Nguyen* (2009) 46 Cal.4th 1007.

well. The Legislature set forth the preference in [section] 3055 to further punish individuals with a strike and could be rationally based on desire to punish repeat offenders. I'm not sure that issue is before me, but that is my thought on that. Similarly, *Nguyen* is settled law. If that law changes, you make your record and seek review to the extent the law allows you to at that point. On the 12022.53 (d) gun enhancement and 12022.5 (a) enhancement, that is before the court.

"I heard your arguments. I don't think it's appropriate to strike that allegation even in light of the defendant's life as listed or described in the papers. This was what strikes me and what stands out is this was over a discussion or order, whatever you call it, to move out of the house, get out of the house, whatever it might be. And that to me when I was thinking about this falls within the normal range of things we just have to deal with in life. It's not particularly egregious or outlandish to be asked to move out, but when you respond in this fashion firing shots behind a closed door ultimately killing someone, that is very, very dangerous. And it's what I think the statute is designed to punish, this sort of conduct. Where is the mitigation . . . ? You got someone who is killed in some fashion over something that never should have led to that.

"So I just don't see where there would be valid legal grounds or grounds in the interest of justice to strike this enhancement. This is what the Legislature contemplated for this very type of offense, and as to [the] cruel and unusual punishment argument, again, this was not remanded to the court for this issue. So I'm not conceding—or you raised it in the context of new changes in the law, [section] 3051, so I'll address it. Again, I'm not sure if it's in front of me to the extent whether I would have to consider whether this is disproportionate sentence to all other similar type crime or are there

15

more serious crimes that are punished less severe than this one, some unfairness in that regard, shock the conscious or offend human dignity. This is what the Legislature imposed. I don't find it disproportionate nor cruel and unusual under the law. I mean, it is sad. There is a sad situation on both sides here, but this is in my view proper under the law, this sentence. So for those reasons I am denying the motion. His sentence will remain as previously imposed."

At no point during the hearing did the trial court even mention *Miller*, *Graham*, or *Caballero*.

Immediately following the court's ruling above, Mr. Gordon raised another argument, one he had not made before. This is what occurred:

"MR. GORDON: There is one issue I forgot to mention because it's not as weighty as the other issues. There is a new case regarding fines and fees, *People v. Dueñas* (2019) 30 Cal.App.5th 1157. When I looked at the judgment from the sentencing it looked like the only fee the court imposed was $300, the restitution fund fine. If I read *Dueñas* correctly, the court can impose that. But it has to be stayed until it's demonstrated he has ability to pay. I apologize for not putting this in the brief. With the other issues this slipped my mind, so I would ask the court in regards to the restitution fund fine stay it pending hearing about his ability to pay."

This colloquy followed:

"THE COURT: I have not read *Dueñas*. I heard it. It does instruct the court to stay this fine at this point?

"MR. GORDON: That's how I read it. You can put it over for that sole issue.

"THE COURT: Why don't you approach, and I'll take a look at that. So the operative language here, and again I know we're talking about a

16

minimum fine, but it says we also hold that although Penal Code section 1202.4 bars consideration of the defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless I hold inability to pay. $300 is the statutory minimum.

"MR. GORDON: It is.

"THE COURT: So that scenario I don't have to stay it.

"MR. GORDON: Maybe I misread it. I was under the impression the court had to impose it but stay pending ability to pay.

"THE COURT: I will rely on that and I read the law as requiring that only if I impose above the minimum statutory fine under 1202.4, which $300 is the minimum. So deny your request at this point on that. Those are the orders. So [defendant] will be remanded for delivery back to [the] Department of Corrections to serve his sentence. Thank you.

"MR. SEQUEIRA: Thank you."

**The Second Appeal**

On April 2, 2020, again represented by Ms. Kelly, defendant filed his opening brief on this appeal. This brief has six arguments: (1) the trial court abused its discretion in refusing to strike the enhancement; (2) section 3051 lacks a rational basis to the extent it denies youth offender parole hearings to inmates with a juvenile strike, and violates equal protection; (3) the trial court abused its discretion in refusing to strike the juvenile strike; (4) defendant's sentence violates the Eighth Amendment and Article 1, section 17 of the California Constitution; (5) the use of defendant's juvenile adjudication as a strike prior violated his right to a jury trial under the Sixth Amendment; and (6) the trial court erred in refusing to stay the section 1202.4 fine absent a determination that defendant is able to pay the fine.

17

On April 2, the same day defendant's opening brief was filed, Ms. Kelly filed on his behalf a petition for writ of habeas corpus (petition). The petition is 79 pages, included within which are five declarations, of: (1) Robin Keeney, defendant's trial counsel; (2) defendant; (3) defendant's father; (4) Mr. Gordon, defendant's attorney following remand; and (5) Ms. Kelly, defendant's attorney on the first appeal, this appeal, and the petition. On August 28, Ms. Kelly filed a subsequent declaration concerning Mr. Keeney.

The petition has four arguments, numbered IV through VII in the table of contents, which arguments we quote verbatim:

"IV. Trial counsel was ineffective in failing to inform Mr. Ceballos of a potential plea agreement with a sentence of 17 or 18 years and in failing to advise him to pursue such a plea bargain. [¶] . . . [¶]

"V. Penal Code section 3051, subdivision (h), violates Equal Protection to the extent it denies youth offender parole hearings to inmates with juvenile strikes. [¶] . . . [¶]

"VI. The trial court abused its discretion in refusing to strike Mr. Ceballos's juvenile strike. [¶] . . . [¶]

"VII. Mr. Ceballos's sentence, which does not afford a meaningful opportunity for release in his lifetime, violates the Eighth Amendment and Article I, section 17 of the California Constitution."

## DISCUSSION

### Introduction to the Analysis

Referring to the arguments in defendant's opening brief on appeal and in his petition, it is immediately apparent that two of the arguments in his appeal and in his petition are identical to arguments defendant made in his first appeal, which arguments we rejected. As to these arguments, defendant

18

acknowledges that they are set forth for purposes of exhaustion, and nothing more will be said about them here.

The result is that what remains on the appeal are four arguments, only one of which, the first, deals with the issue that caused our limited remand. As to the other arguments, the People assert that at least two of them, arguments numbered two (equal protection) and five (violation of right to jury trial) were waived, as the arguments could have been made in the first appeal. Defendant vigorously disagrees, the result of which is that the parties devote significant portions of their briefs to the issue of waiver.

We will not weigh in on the issue here, for several reasons.

First, until the outcome of defendant's petition for writ of habeas corpus is known, defendant's sentence situation may be different than it currently is.

Second, and as noted, the arguments were not fully briefed below, and the trial court did not have the benefit of the applicable law.

Third, defendant suggests the issues are cognizable in his petition for writ of habeas corpus.

We thus turn to the two issues that are properly before us, beginning with the trial court's refusal to strike the arming enhancement.

**The Refusal to Strike the Arming Enhancement Did Not Take Into Account All Applicable Principles**

The amended section 12022.53 provides that "(h) The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." As quoted, our remand was for the court to "exercise its discretion under subdivision (h)," and as defendant acknowledges we review the ruling for abuse of discretion.

19

**The Law of Discretion**

Defendant's brief sets forth some boilerplate principles of discretion, and what is involved in its exercise. But the brief does not set forth the applicable principles governing what is its abuse, which has been described in terms of a decision that "exceeds the bounds of reason" (*People v. Beames* (2007) 40 Cal.4th 907, 920), or one that is arbitrary, capricious, patently absurd, or even whimsical. (See, e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 [" ' "arbitrary, capricious, or patently absurd" ' "]; *People v. Benavides* (2005) 35 Cal.4th 69, 88 [ruling "falls 'outside the bounds of reason' "]; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614 ["arbitrary, whimsical, or capricious"].) In its most recent observation on the subject, our Supreme Court said that "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).)

If we were to apply those principles here, we could not conclude the trial court abused its discretion.

But there is more to abuse of discretion than arbitrary, whimsical, or capricious, as we discussed in *People v. Jacobs* (2007) 156 Cal.App.4th 728, 736–738:

"[T]here is other language which guides us here, illustrated by that in *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 (*Drew*), where the Third Appellate District rejected the contention that the sole test of abuse of discretion was whether the trial court's action was 'whimsical, arbitrary, or capricious,' stating as follows: 'This pejorative boilerplate is misleading since it implies that in every case in which a trial court is reversed for an abuse of

20

discretion its action was utterly irrational.  Although irrationality is beyond the legal pale it does not mark the legal boundaries which fence in discretion.'

"Elaborating, the Court of Appeal further explained:  'Very little of general significance can be said about discretion.  " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.  [Citation.]' " (*Westside Community for Independent Living, Inc. v. Obledo* (198[3]) 33 Cal.3d 348, 355, citing to 6 Witkin, Cal Procedure (2d ed. 1971) Appeal, § 244.)  The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ."  Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.  [Citation.]' (*Drew*, *supra*, 207 Cal.App.3d at p. 1297.)  Finally, as *Drew* noted, the 'legal principles that govern the subject of discretionary action vary greatly with context.  [Citation.]  They are derived from the common law or statutes under which discretion is conferred.' (*Id.* at p. 1298.) [¶] . . . [¶]

"In *Concord Communities v. City of Concord* (2001) 91 Cal.App.4th 1407, 1417 our colleagues in Division Four of this court observed that 'Abuse of discretion has at least two components:  a factual component . . . and a legal component.  [Citation.]  This legal component of discretion was best explained long ago in *Bailey v. Taaffe* (1866) 29 Cal. 422, 424:  "The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles.  It is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a

21

manner to subserve and not to impede or defeat the ends of substantial justice. . . .” ’

"All this is well described in Witkin where, likewise citing the still vital *Bailey v. Taaffe, supra*, 29 Cal. 422, 424, the author distills the principle as follows: ‘Limits of Legal Discretion. [¶] The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. (See 5 Am.Jur.2d, Appellate Review § 695.) . . .’ (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 358, pp. 406–407.”[10]

**Some Guiding Legal Principles**

As quoted, amended section 12022.53 gives the trial court authority to strike a firearm enhancement "in the interests of justice," a term, we conclude, that in the circumstances here must include some consideration of defendant's age and the factors attendant to it, as reflected in the spirit of various developments in the law, including, by way of example, section 3051.

Section 3051 was enacted in recognition that "[e]xisting sentencing laws do not distinguish youth from adults." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 260 (2013–2014 Reg. Sess.) July 2, 2013, p. 4.) The purpose of the act was "to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he

---

[10] In *Sargon*, quoted above, the Supreme Court went on to endorse this expression of the standard: " ‘The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.’ ” (*Sargon, supra*, 55 Cal.4th at p. 773, quoting 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 364, p. 420.)

or she has been rehabilitated and gained maturity." (Stats. 2013, ch. 312, § 1.)

"Despite the fact that the line between youth and adulthood has traditionally been drawn at 18 years of age, recent amendments to section 3051 recognize that the maturity process does not end at 18 and in many cases extends to at least 25 years of age. In 2015, relying on the evolving understanding of brain development, the Legislature amended section 3051 to provide relief for most offenders who committed their offenses before reaching the age of 23. (Stats. 2015, ch. 471, § 1.) According to the author of the amendment, 'Recent scientific evidence on adolescent and young adult development and neuroscience shows that certain areas of the brain—particularly those affecting judgment and decision-making—do not fully develop until the early-to-mid-20s. Various studies by researchers from Stanford University (2009), University of Alberta (2011), and the National Institute of Mental Health (2011) all confirm that the process of brain development continues well beyond age 18.' (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 261 (2015–2016 Reg. Sess.) Apr. 28, 2015, p. 3.)" (*In re Jones* (2019) 42 Cal.App.5th 477, 484–485, conc. opn. of Pollak, J.)

And Assembly Bill No. 1308, which became law on January 1, 2018, raised the age limit for eligibility for relief under the Youth Offender Statute to age 25, doing so, in the words of the legislative history, because: " 'AB 1308 would align public policy with scientific research. This measure would expand eligibility of the youth parole hearing process to certain individuals who were 25 or under when they committed a crime for which they received a lengthy or life sentence for a youth offender parole hearing. Scientific evidence on adolescence and young adult development and neuroscience shows that certain areas of the brain, particularly those

23

affecting judgment and decision-making, do not develop until the early-to-mid-20s.  Research has shown that the prefrontal cortex doesn't have nearly the functional capacity at age 18 as it does at 25.  The prefrontal cortex is responsible for a variety of important functions of the brain including: attention, complex planning, decision making, impulse control, logical thinking, organized thinking, personality development, risk management, and short-term memory.  These functions are highly relevant to criminal behavior and culpability.  [¶]  Since the passage of [Senate Bill No.] 260 and [Senate Bill No.] 261 motivation to focus on rehabilitation has increased.  An offender is more likely to enroll in school, drop out of a gang, or participate in positive programs if they can sit before a parole board sooner, if at all, and have a chance of being released.' " (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1308, as amended March 30, 2017  (2017–2018 Reg. Sess.) Apr. 25, 2017, pp. 2–3.)

It is apparent from the lengthy quotation of the trial court's ruling set forth above that the court made no analysis whether the "interests of justice" included any analysis of defendant's age, or any factors relating to it.  More specifically, other than a passing reference to defendant's age in connection with the court's prior *Romero* ruling over two years before—"my analysis under *Romero* has not changed in light of Penal Code section 3051 referencing now someone under 25 their brains are not fully developed"—the trial court never mentioned, let alone analyzed, the numerous factors *Miller*, *supra*, 567 U.S. 460 identified as bearing on the " 'distinctive attributes of youth' and how these attributes 'diminish[ed] the penological justifications for imposing the harshest sentences . . . .' " (*In re Kirchner* (2017) 2 Cal.5th 1040, 1042.)  This would include, for example, evaluation of the circumstances pertaining to defendant's "immaturity, impetuosity, and

24

failure to appreciate risks and consequences" at the time of his offense and to "the family and home environment that surround[ed] [him]—and from which he [may not have been able to] usually extricate himself—no matter how brutal and or dysfunctional." (*Miller, supra,* 567 U.S. at p. 477.)

In sum, it is clear the trial court did not analyze the situation "in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . ." (*Bailey v. Taaffe, supra,* 29 Cal. at p. 424.)[11]  And we remand again, so it can do so,

---

[11] For example, in refusing to strike the enhancement, the trial court stated it considered defendant's "life as listed or described in the papers." The trial court observed that the event that preceded the shooting—defendant being told to move out of the house—was not particularly provocative but rather was "within the normal range of things we just have to deal with in life," and defendant's response was "very, very dangerous."  As to this "dangerous" comment, we note that all cases involving the possible imposition of a firearm enhancement necessarily involve "dangerous" actions. But the amendment to section 12022.53, subdivision (h)—permitting a trial court to exercise its discretion in the imposition of a 25-year enhancement—is a clear message to trial courts that the punishment is not appropriate in every case, including an implied malice second degree murder conviction.

The court further noted that the firearm enhancement was designed to punish this sort of behavior and was not disproportionate to the crime, but did not consider its application to a person of defendant's age and in defendant's circumstances, for whom the firearm enhancement, in light of the rest of the sentence, would result in the denial of parole until age 79—resulting in a sentence commonly called a "de facto LWOP."

Moreover, although the trial court adverted to defendant's "life as . . . described in the papers," and was aware that defendant had a history of juvenile offenses, beginning when he was 13, the trial court did not consider the implications of defendant's age or the facts of his juvenile strike:  a robbery committed with other teenagers; no weapon was used; there was only minimal injury; and defendant was neither the instigator nor the main aggressor.

25

especially in light of the court's comment that defendant was "not a lost cause."[12]

**The Refusal to Stay the Minimum Restitution Fine was Not Error**

At defendant's original sentencing in May 2016, the trial court imposed the minimum restitution fine of $300. As noted, at the resentencing hearing defendant belatedly contended he was entitled to have that restitution fine stayed or, in the alternative, stricken, pending a hearing on his ability to pay. The trial court rejected the argument, a rejection defendant appeals here.

As indicated above, the issue of ability was raised orally at the end of the sentencing hearing was there, as it is here, based on *People v. Dueñas*, *supra*, 30 Cal.App.5th 1157 (*Dueñas*). *Dueñas* involved the now familiar case of Velia Dueñas, a homeless, indigent person who was on her fourth

---

[12] At the time of defendant's *original* sentencing—before it had the legal discretion to not impose the 25-year firearm enhancement—the trial court stated, "I do want to take note of the defendant's letter, something that is striking and worthy of note, where he writes, 'since that is not the case'—regarding he could have taken some time to reflect and none of this would have happened—'since that is not the case, I pray that my punishment gives my victims' family some type of closure for their loss. Also, in deciding my punishment, I ask humbly that you are able to recognize and believe that I am in no way a lost cause.' "

The trial court continued, "That's worthy to note, and that's certainly—I recognize the sentence is what it is, but that is worth noting. I don't think anyone here, at this point, thinks you are a lost cause Mr. Ceballos. You have other opportunities. I recognized the pain of this sentence, as well. But you are not a lost cause, and, at least, I want you to know that before leaving here today."

At the time the trial court made these remarks about defendant not being a "lost cause" at the age of 24, it was required to impose the firearm enhancement. Our remand gives the trial court the opportunity to consider this issue anew in light of all of the factors discussed in this opinion.

conviction for driving with a suspended license, placed on probation and, yet again, ordered to pay mandatory assessments and fines, including a $150 restitution fine under section 1202.4, subdivision (c).[13] The court held that "although the trial court is required by Penal Code section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1172.)

*Dueñas* has spawned a plethora of cases, many of which have distinguished it on the facts before them, with many others holding that *Dueñas* was wrongly decided, several of which cases are pending before the Supreme Court. A relatively early case illustrating all this is the 2-1 opinion in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844 (*Kopp*), where the majority opinion analyzed the issue based on the distinction between fines and charges that are punitive in nature and those that are not. And as to the former, the majority held they should be challenged under the excessive fines clauses in the United States and California Constitutions. (*Id.* at pp. 96–97.)

A recent case along those lines is *People v. Cowan* (2020) 47 Cal.App.5th 32, review granted June 17, 2020, S261952, where our colleagues in Division Four have a lengthy discussion of *Dueñas* and its progeny, including a collection of "the *Dueñas* critics" (*Cowan*, *supra*,

---

[13] Section 1202.4 provides that "[t]he court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)."

27

47 Cal.App.5th at p. 39), and adopts the excessive fines approach. (*Id.* at p. 42.) We adopt this view, concluding that the approach taken in *Kopp* is correct, where the court explained this distinction: "[W]e do not follow the court's approach to restitution fines in *Dueñas*. There, the court acknowledged that the restitution fine under section 1202.4 is 'additional punishment for a crime.' (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1169.) Yet, the court still focused solely on a defendant's ability to pay in determining whether such a punitive fine is constitutional. To this end, the court held: '[A]lthough Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine.' (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) We disagree that this approach should apply to all punitive fines in the first instance. Instead, because these fines are intended to punish defendants, we agree with the People that a defendant should challenge such fines under the excessive fines clause of the Eighth Amendment of the federal Constitution and Article I, section 17 of the California Constitution. Put differently, there is no due process requirement that the court hold an ability to pay hearing before imposing a punitive fine and only impose the fine if it determines the defendant can afford to pay it." (*Kopp*, *supra*, 38 Cal.App.5th at pp. 96–97.)

And so analyzed, the $300 minimum restitution fine imposed here is not excessive. A fine is excessive under the Eighth Amendment "if it is grossly disproportional to the gravity of a defendant's offense" (*United States v. Bajakajian* (1998) 524 U.S. 321, 334), an analysis made by considering four factors: " '(1) the defendant's culpability; (2) the relationship

28

between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay.' " (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1070, citing *People ex. rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728.)

Here, defendant was convicted of second degree murder after he fired eight shots through a closed door of a bedroom occupied by five people, killing Troy in the presence of his son, for which defendant was sentenced to 55 years to life. In light of this, the $300 restitution fine—the minimum fine provided for by statute—was minor when compared to his sentence and the gravity of the offenses.

Finally, we note that even if the decision were error, it would have been harmless error, because defendant will be in custody long enough to pay the $300 in issue here. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) Defendant was sentenced to a lengthy prison term of 55 years to life; at the time of sentencing, he was 29 years old; and nothing in the record points to any circumstance casting a doubt on his ability to obtain the funds for payment in the future, future earnings, including prison wages, that are relevant as a constitutional matter. (See *People v. Aviles*, *supra*, 39 Cal.App.5th at p. 1076; § 1202.4, subd. (d) [in considering a defendant's inability to pay as a factor in setting the amount of the fine in excess of the minimum fine, "[c]onsideration of a defendant's inability to pay may include his or her future earning capacity"].)

**The Petition Will Be Heard in the Superior Court**

In response to defendant's appeal and his petition for writ of habeas corpus, the Attorney General has filed a combined respondent's brief and informal opposition to the petition. The opposition portion of the brief, which is 25-pages long, argues that the petition should be summarily denied on the

basis it fails to allege a prima facie showing of ineffective assistance of counsel. It also asserts "as a threshold matter" that it would be "appropriate to deny the petition without prejudice to allow the lower court to weigh in on the issues raised."

In support, respondent cites the recent case of *Robinson v. Lewis* (2020) 9 Cal.5th 883, 895 (*Robinson*), where a unanimous Supreme Court observed as follows: "All courts in California have original habeas corpus jurisdiction, but that does not mean all courts must exercise it in all circumstances. A higher court 'has discretion to deny without prejudice a habeas corpus petition that was not filed first in a proper lower court.' [Citations.] For this reason, the United States Supreme Court has observed that 'California's habeas rules lead a prisoner ordinarily to file a petition in a lower court first.' (*Carey v. Saffold* [(2002)] 536 U.S. [214,] 221.) We agree. Petitioners should first file a petition for a writ of habeas corpus challenging a judgment in the superior court that rendered the judgment. If the superior court denies the petition, the petitioner may then file a new petition in the Court of Appeal. [Fn. omitted.]"[14]

After citing *Robinson*, respondent's brief goes on: "As the Court of Appeal observed in *Ex parte Elias*, 'particularly where the taking of evidence is involved, the local court is often better able to render timely and effective relief than a court of appeal, and it is for this reason that appellate courts frequently refuse to issue the writ unless application has first been made therefor to the superior court or unless a good reason is shown in the petition for failure to have made such application.' (*Ex parte Elias* (1962)

---

[14] The footnote noted an exception that a "petition for a writ of habeas corpus may be filed in the Court of Appeal in the first instance if it is related to a pending direct appeal." (*Robinson, supra*, 9 Cal.5th at p. 895, fn. 5.)

209 Cal.App.2d 262, 264; see *Rose v. Superior Court* (2000) 81 Cal.App.4th 564, 574 ['in the few petitions that require an evidentiary hearing, appellate courts often transfer the petitions to the trial court'].) [Defendant's] petition relies on multiple factual allegations involving local practices pertaining to negotiation of pleas that a trial court is better equipped to hear and evaluate."

In his reply brief and informal reply to respondent's opposition, defendant states he does not object to the petition being transferred to the superior court, acknowledging respondent's position that an "evidentiary hearing will be necessary to resolve [defendant's] claim." Indeed it will, certainly on his primary claim of ineffective assistance of counsel.

By way of illustration, defendant's claim includes that prior to trial his counsel failed to inform him that the prosecutor had stated his office would consider a plea offer of guilt in exchange for a sentence of 17 or 18 years, if the defense initiated the request. Defendant also contends that counsel failed to advise him that even if his defense of involuntary manslaughter were successful, he would face a sentence of 18 years based on his prior strike offense and the gun enhancement. Moreover, defendant attaches a declaration from trial counsel Robin Keeney, who among other things testifies that he has "a vague memory" of his conversation with defendant, and at another point testifies that his doctor told him his "cognition and memory are impaired." This, of course, raises fact-intensive questions as to Mr. Keeney's cognitive function in 2015 when defendant's trial was held.

Defendant's claim would also include evidence as to the process and procedures of the district attorney's office in 2014 and 2015, as well as the particular position of the office in his case. Indeed, Ms. Kelly acknowledges

31

as much, testifying as to her attempt to contact the particular deputy district attorney involved in defendant's case, and receiving no response.[15]

## DISPOSITION

The matter is remanded to the superior court to exercise its discretion in light of all applicable principles.  The restitution fine is affirmed.  And as to the petition for writ of habeas corpus, as set forth in a separate order filed today, an order to show cause will issue returnable in the superior court.

---

[15] The deputy district attorney is now a superior court judge.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Miller, J.

*People v. Ceballos* (A158314)

33